**VALLEY VIEW SHOPPING CENTER LTD.**

v.

**The UNITED STATES.**

No. 96–75.

United States Court of Claims.

May 12, 1976.

Robert J. Campbell, Kansas City, Mo., atty. of record, for plaintiff.

Donnie Hoover, Washington, D. C., with whom was Asst. Atty. Gen., Rex E. Lee, Washington, D. C., for defendant.

Before DAVIS, NICHOLS and BENNETT, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

BENNETT, Judge:

Plaintiff brings this suit seeking judgment for certain proceeds of a "lease rental guarantee insurance policy" written by the Small Business Administration (SBA) and running to plaintiff as beneficiary. First enacted in section 316(a) of the Housing and Urban Development Act of 1965, 79 Stat. 482 (now codified in 15 U.S.C. § 692 (1970)), section 401 of the Small Business Investment Act of 1958 allows SBA in its discretion to guarantee payment of rentals under leases of commercial and industrial

property entered into by qualified small business concerns, all to the end of creating an inducement for property owners to rent business properties to small business tenants.[1] The parties' research, as well as our own, indicates that no reported decisions have to date examined this provision of law. As more particularly described below, the instant case involves an insured landlord who could not collect from its tenant and was forced, when efforts to accommodate the needs of the tenant failed, to call upon SBA to make good its obligation as guarantor of defaulted rent.

The cross-motions for summary judgment, exhibits, and supporting briefs show that there is no genuine dispute as to any material fact. The case is ripe for decision at this time under Rule 101. We agree with the position of the plaintiff for reasons given below.

On April 6, 1971, Central Cinema Company, Inc. (CCC), as lessee, and plaintiff, as lessor, executed a lease for space in the Valley View Shopping Center, Overland Park, Kansas. The lessor demised to the small business lessee a term of 15 years to commence in June 1972, reserving a minimum monthly rental of $3,612.50. The SBA, on June 10, 1972, issued a "lease rental guarantee insurance policy" to CCC, naming plaintiff as beneficiary. The policy undertook to guarantee payment of up to 75 percent of the rent set forth in the lease. The total "guaranteed rent" for the 15-year term was $487,620, subject to a "three-month rent deductible endorsement." Thus, SBA's liability as guarantor was limited to rent which might accrue to the lessor subsequent to the first 3 months of any default in payment by CCC.

Plaintiff and defendant agree that CCC paid its rent only sporadically after the term commenced. Defendant takes no issue with an exhibit filed by plaintiff showing that the check drawn by CCC to plaintiff's order for July 1972 rent was returned for lack of sufficient funds on deposit with the drawee. On May 2, 1973, plaintiff sent a written notice of the tenant's default simultaneously to CCC and to SBA, listing past-due rent and charges in the amount of $26,472.61.[2] A further notice dated June 6, 1973, advised SBA of the lessor's intention to terminate CCC's tenancy and to file claims under the policy. A claim for insurance benefits was filed on June 14, 1973, of which defendant has paid no part. Both the SBA regional office in Kansas City and the Washington agency headquarters took the position that SBA's liability under the insurance policy attached only for past-due rent payments accruing to the lessor *after* (1) formal notice of default was served (here, May 2, 1973) and (2) the 3-month deductible period thereafter had gone by.

---

1. 15 U.S.C. § 692 (1970) provides in pertinent part:

"(a) *Non-availability of guarantees from other sources; participation with qualified sureties.*

"The Administration may, whenever it determines such action to be necessary or desirable, and upon such terms and conditions as it may prescribe, guarantee the payment of rentals under leases of commercial and industrial property entered into by small business concerns to enable such concerns to obtain such leases. Any such guarantee may be made or effected either directly or in cooperation with any qualified surety company or other qualified company through a participation agreement with such company. * * *."

A member of the SBA General Counsel's staff once said: "The purpose of this guarantee authority is to enable a small business without blue-chip credit to obtain space in a good location that is usually available only to a triple-A credit business. The program was initially proposed for use in shopping centers, * * *." R. D. Turner, *A Cryptic Resource for Small Business,* 57 A.B.A.J. 691, 694 (1971).

2. This notice was required by 13 C.F.R. § 106.-11(b) (1973):

"Upon the occurrence of a default by the lessee under the insured lease, the lessor shall give written notice simultaneously to the lessee and to the insurer of the specific default."

Paragraph 9, Part II, of the policy provides: "Upon the occurrence of a default as defined herein the Lessor shall simultaneously give written notice to the Lessee and to SBA. Unless the default is corrected within 30 days from the date of notice of default, the Lessor shall, within 10 days thereafter give SBA notice that it is taking action to terminate the occupancy of the Lessee and intends to file claims. This notice shall include the total amount of unpaid guaranteed rent and the dates on which each unpaid installment was due, * * · *."

So, in SBA's view, the deductible period ended August 1, 1973, and its obligation thereafter would be reduced by the amount of rent paid by the new tenant. Hence, SBA maintained then, as it maintains in this court, that it encounters no liability at all since the property was rented to a new tenant in August. Plaintiff filed its petition here on April 23, 1975.

The principal issue framed for our decision by the parties is whether under this insurance policy the lessor-beneficiary is entitled to recover past-due rent from SBA accrued prior to plaintiff's formal notice of default. Defendant answers this in the negative, referring us to the words found in the policy's "insuring agreement":

> The Small Business Administration ( * * * hereinafter called "SBA") agrees with the Lessee, in consideration of the payment of the premium * * * subject to all of the terms and conditions of Part II, to guarantee the payment of that portion of the Insured Rent which *shall be due* and unpaid to the Lessor during the policy period *by reason of the Lessee's default.* [Emphasis added.]

The term "default" is defined in Part II, Conditions, paragraph 1(f):

> (f) Default—Any failure by Lessee to perform any of the covenants and conditions of the Lease, *which results in a written demand for possession* by Lessor, shall constitute a "default". [Emphasis added.]

Defendant first observes that a "default" within the meaning of the policy differs from a default under the lease. While a failure to pay rent might ordinarily be considered a default under the *lease,* such failure of payment does not assume the status of default as the term is understood in the *policy* until such time as the lessor provides "a written demand for possession." Thus, while the rent may go unpaid for months, no default occurs under the *policy,* defendant tells us, unless and until the lessor makes it a default by giving a written demand for possession. Under this concept only the final failure of payment by the lessee—being the failure which precipitates

the demand—constitutes a default. Defendant then bolsters its position by emphasizing the words "Insured Rent which *shall* be due [emphasis added]." Use of the future tense indicates to defendant the meaning that only rent becoming due *after notice* of default falls within the coverage of the policy, subject to the 3-month deductible endorsement. Defendant tells us that this technical interpretation must be approved so that a lessor will not sit idly by, declaring a default only when most advantageous to it and thereby maximizing the liability of SBA.

We do not attach much weight to the argument that unless we adopt defendant's interpretation, lessors will allow defaulted rent to accumulate. First, the policy in this case covered only 75 percent of the rent reserved in the lease. Moreover, during the time the lessor would allow rent to accrue without notice of default it would not have the use of the funds. It does not seem reasonable to expect that an insurance beneficiary would be content to do nothing while, as a practical matter, accumulating nothing more than a claim to 75 percent of that which may be presumed to be the reasonable value of the leased premises. The consequences defendant conjures up are imagined, not real.

Other language in the policy indicates that its coverage reaches back in time, compensating for rent which is past due at the time of a formal notice of default. Thus, in paragraph 9, Part II, it is said:

> * * * This notice [the notice of default] shall include the *total amount of unpaid guaranteed rent* and the dates on which *each unpaid installment was due,* * * *. [Emphasis added.]

In paragraph 12(c), Part II, the policy continues:

> * * * The Lessor's claim and SBA's liability shall be limited to that portion of the Insured Rent which is due and payable without regard to any provision of the Lease the effect of which is to accelerate the due date of any installment. * * *.

"Insured rent" is defined in paragraph 1(h) of Part II as—

> * * * the *total of the unpaid installments* of the aggregate amount of guaranteed rent set forth in Part I, which shall be due the Lessor during the policy period under the terms of the Lease * * *. [Emphasis added.]

Finally, the first sentence of paragraph 9, Part II,[3] provides:

> * * * Upon the occurrence of a default *as defined herein* the Lessor shall simultaneously give written notice to the Lessee and to SBA. * * *. [Emphasis added.]

This wording belies defendant's interpretation of default for policy purposes. If a policy default obtains only upon notice and demand for possession, as defendant maintains, then the *additional* notice obligatory under paragraph 9 becomes entirely meaningless, as well as the definition of insured rent in paragraph 1(h), Part II.

■ The most charitable observation which can be made, so far as defendant's position is concerned, is that the insuring agreement in Part I of the policy suffers from some latent ambiguity in delimiting the scope of coverage. Assuming for discussion that defendant's interpretation resides within the zone of reasonableness, so too does plaintiff's. Accordingly, the doubt will be resolved against the party who drafted the questioned language, as against the others who relied on it in good faith. *H & M Moving, Inc. v. United States,* 204 Ct.Cl. 696, 499 F.2d 660 (1974); *United Pac. Ins. Co. v. United States,* 204 Ct.Cl. 686, 497 F.2d 1402 (1974); *Blount Bros. Constr. Co. v. United States,* 171 Ct.Cl. 478, 346 F.2d 962 (1965); *WPC Enterprises, Inc. v. United States,* 163 Ct.Cl. 1, 323 F.2d 874 (1963); Restatement, Contracts § 236(d) (1932).

■ More fundamentally, however, we should hesitate to adopt a construction which would contravene the basic purposes of the governing legislation. We have observed, heretofore, that the lease guarantee program was enacted to make commercial and industrial property leases available to small business.[4] That goal would largely be defeated if we set down an ironclad rule which would require a lessor to forego the exercise of any judgment and to initiate termination of the small business lease instantly with the first late rent payment in order to protect its rights under the policy. The courts will not subscribe to an interpretation of contractual language which produces an absurd or whimsical result. *Northwest Marine Iron Works v. United States,* 203 Ct.Cl. 629, 637, 493 F.2d 652, 657 (1974). We think the basic policy promise should be enforced according to its tenor: that SBA will pay the lessor such insured rent as the lessee fails to pay during the policy period, subject naturally to the further conditions set forth in the contract. A default for policy purposes is "any" failure to perform a lease covenant which results in a written demand for possession. In the present case, all of the missed rent payments between the inception of the term and May 2, 1973, resulted in the written demand for possession on that date. Each of such missed payments occupies the category of default as defined in paragraph 1(f) of Part II, since a written demand for possession based thereon was transmitted simultaneously to the tenant and SBA on May 2, 1973.

■ We caution, however, that we do not countenance undue delay on the part of any insured lessor in apprising SBA of missed rent payments by appropriate declaration of default. Under paragraph 17 of Part II, the policy provides:

> * * * No suit or action for recovery of any claim under. the Policy shall be initiated in any court of Law or equity or in any administrative proceeding unless all of the conditions of the Policy shall first have been complied with and unless such suit or action is commenced within two (2) years after the earliest date on which the existence of the loss can be reasonably determined.

---

3. *See* note 2, *supra.*

4. *See* note 1, *supra,* and 13 C.F.R. § 106.2 (1973).

The import of this language is that the lessor has a "reasonable" time within which to determine that the tenant has no prospect of paying all or a portion of the insured rent. Thus, one need not necessarily jump at the first late payment. But when by reason of one or more missed rental installments existence of loss first becomes evident in reasonable contemplation, the lessor must give notice of default, and initiate collection efforts against SBA in the appropriate administrative or judicial proceedings within not more than 2 years. Thereafter the claim is wholly barred. We will have no difficulty in giving effect to this policy provision, for SBA may grant lease guarantees "upon such terms and conditions as it may prescribe." 15 U.S.C. § 692 (1970).

In the instant case we are satisfied that the insured lessor acted in a timely manner. The undisputed evidence shows that partial payments were made by CCC as late as February 12, 1973. Between January 8 and February 12, in fact, the tenant made partial payments on account totaling $7,780.09. Less than 3 months later plaintiff protected its rights by giving notice of default, and within 2 years of this notice plaintiff exhausted its administrative remedy and filed a petition here. We think plaintiff acted with reasonable diligence and ought to be paid.

Defendant's motion for summary judgment is denied, and plaintiff's cross-motion for summary judgment is allowed. Judgment is entered for plaintiff on liability and the case is remanded to the Trial Division for computation of the amount of recovery pursuant to Rule 131(c), in accordance with the foregoing opinion.