**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Mark IRVINE, Defendant-Appellant.**

**No. 83–3099.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 4, 1984.

Decided March 27, 1985.

Jerry Diskin, Asst. U.S. Atty., Seattle, Wash., for plaintiff-appellee.

William J. Genego, Marc L. Sherman, Los Angeles, Cal., for defendant-appellant.

Before BROWNING, Chief Judge, GOODWIN and SKOPIL, Circuit Judges.

PER CURIAM:

Mark Irvine appeals his convictions for soliciting a bribe and various narcotics offenses. We affirm.

I.

Irvine, a former drug courier, approached the Phoenix police offering information in exchange for money, protection, and immunity from prosecution. He was flown to Seattle in connection with an investigation of Terry Read, a suspected cocaine trafficer. In Seattle, Irvine met with an Assistant United States Attorney who informed him that he would not be given immunity and would have to plead guilty to at least one drug charge, but the court would be informed of his coopertion. He was told not to contact the subjects of the investigation. He continued to provide information.

Later Irvine contacted Read and informed him of the ongoing investigation. The Assistant United States Attorney learned of Irvine's communication with Read and warned Irvine that he would be liable to a charge of obstruction of justice if he had any further contact with any of the subjects of the investigation.

Irvine, his attorney, and the Assistant United States Attorney signed a letter agreement including the following terms:

(1) Irvine "will not be charged with any Federal or State drug offenses based upon the statements which [he] made to" government officers;

(2) Irvine agreed to be interviewed by state and federal prosecutors regarding his involvement in cocaine trafficking, and to testify fully and truthfully before the grand jury and at any criminal trials that result from his cooperation;

(3) Irvine would take a polygraph exam if asked;

(4) Irvine would assist in the collection of evidence in this and any other investigation in Western Washington;

(5) the government "will [not] tolerate any deception from you. If your information and testimony prove to be untruthful ... *you will be liable to prosecution for all matters about which we have knowledge, including the use of any statements which you have*

*made....* [Y]ou may additionally be charged with ... obstruction of justice."

(6) Irvine would receive $100 per week for his assistance;

(7) the *"use immunity conferred by this letter shall be transformed into transactional immunity* at the completion of the trials of this case provided you comply in good faith with the four conditions." (Emphasis added.)

Irvine then testified before the grand jury about his activities with Read and Luis Betancourt, another alleged cocaine dealer. Both were indicted. Later, however, Irvine met with Betancourt and offered to leave the country to avoid testifying against Betancourt at trial in return for cocaine worth over $100,000. After Betancourt was arrested, he informed the government of this attempted "shakedown." Irvine was indicted, tried, and convicted of solicitation of a bribe and several drug offenses.

## II.

The statements Irvine made to the government agents and the testimony he gave before the grand jury that indicted Read and Betancourt were offered by the government at Irvine's trial to establish Irvine's guilt of the drug offenses. Irvine objected on the ground that the immunity agreement barred the use of his statements and testimony for this purpose. He moved to dismiss the drug charges on the same ground. The government responded that the agreement did not bar the indictment on the drug charges or the use of the testimony because Irvine had breached the agreement by attempting to bribe Betancourt. The evidence was admitted and the motion to dismiss was denied.

Irvine argues admission of the evidence and the failure to dismiss the drug charges were error for two reasons.

Irvine argues that the agreement, properly interpreted, did not condition immunity upon non-occurrence of improper conduct, such as the bribery attempt.

This argument has two branches. The first is that the letter agreement granted Irvine immediate and unconditional use immunity, as evidenced by the references in paragraph "(1)" that Irvine *"will not* be charged" and in paragraph "(7)" to the "use immunity *conferred by this letter."* This interpretation is inconsistent with the provision of paragraph "(5)" that Irvine could be prosecuted and that any statements he made could be used against him if the information he gave under the agreement proved to be untruthful.

The second and somewhat inconsistent branch of this argument assumes the letter agreement granted only conditional immunity, but contends the only condition imposed by the government was that Irvine's testimony be truthful. Irvine argues that any other improper conduct by Irvine, including the solicitation of a bribe from Betancourt, was extraneous to the agreement—perhaps independently punishable, but not, under the agreement, a precondition to the grant of immunity from use of his testimony.

The district court rejected this interpretation of the agreement as "illogical" asserting it would produce "a travesty of justice." The court pointed out that the government would hardly have bargained for an agreement that Irvine would testify against Betancourt before the grand jury to obtain an indictment, but could solicit a bribe from Betancourt to absent himself from the trial. The court considered it "the heart of the agreement" that Irvine would so conduct himself as to facilitate the conviction of Betancourt, not frustrate it.

Generally speaking, a cooperation-immunity agreement is contractual in nature and subject to contract law standards. *United States v. Carrillo,* 709 F.2d 35, 36–37 (9th Cir.1983); *cf. United States v. Arnett,* 628 F.2d 1162, 1164 (9th Cir. 1979) (plea bargaining agreement). The language of the contract is to be read as a whole and given a reasonable interpretation, *Shakey's, Inc. v. Covalt,* 704 F.2d 426, 434 (9th Cir.1983), not an interpretation that would produce absurd results. *Valley View Shopping Center Ltd. v. United*

*States*, 535 F.2d 42, 46, 210 Ct.Cl. 89 (1976). "[I]t is our task to construe the words used to try, if possible, to carry out the intention of the parties in light of all the facts and surrounding circumstances...." *Matter of Wellins*, 627 F.2d 969, 971 (9th Cir.1980).

█ The district court correctly interpreted the language of the agreement. The agreement provides that if Irvine's "information"—a term broader than mere testimony—is untruthful, he may be prosecuted and his statements may be used against him. This warning is given in conjunction with a broad prohibition of "deception." In light of the overriding purpose of the agreement and the repeated warnings to Irvine that he was not to make contact with any person subject to the investigation, these words are insufficient to convey the condition that the grant of immunity would survive an agreement by Irvine to flee the jurisdiction to avoid testifying against Betancourt in return for a bribe.

Irvine's second argument is that even if the bribery attempt did breach the agreement, the government may use Irvine's testimony only in a prosecution for perjury or obstruction of justice and not to convict him of the narcotics offenses in which his statements implicated him.

Irvine relies upon *United States v. Kurzer*, 534 F.2d 511, 518 (2d Cir.1976), but that case is clearly inapplicable here. Kurzer, an accountant, agreed to be interviewed by government agents regarding possible tax violations by Steinman. If the agents were satisfied Kurzer was being truthful and cooperative he would receive immunity under 18 U.S.C. § 6003, and would testify before the grand jury. "In any event, Kurzer was promised that what he told investigators would not be used against him." *Id.* at 513. Kurzer did appear before the grand jury under a formal order to testify and immunity issued under section 6003. The grand jury indicted Steinman. As part of a plea bargain, Steinman agreed to supply information to the government. The information given by Steinman under this agreement led to Kurzer's indictment. Kurzer moved to dismiss the indictment as a product of the immunized information and testimony Kurzer had given against Steinman, reasoning that without this information and testimony Steinman would not have been indicted, would not have entered into the plea agreement, and would not have given the information that led to Kurzer's indictment. The district court granted the motion. The court of appeals remanded for a hearing as to whether Steinman's agreement to cooperate was based on the indictment to which Kurzer's testimony had contributed or, as the government contended, upon factors entirely independent of that indictment.

In the course of its opinion, the court of appeals rejected the government's contention that "Kurzer forfeited his immunity by lying to the Government while immunized," noting that "the ordinary remedy for the Government when an immunized witness lies or fails to cooperate fully is a prosecution for perjury or for contempt, rather than abrogation of the immunity agreement and use of the information truthfully given by the immunized witness to prosecute him for other offenses." *Id.* at 518.

█ The essential difference between this case and *Kurzer* is that the source of the claimed immunity in this case is not section 6003 or the Fifth Amendment, but an agreement the district court properly interpreted as granting immunity only upon a condition that defendant had breached. The opinion in *Kurzer* makes no mention of any such condition in the informal agreement that preceded and governed the interviewing of Kurzer by government agents. Indeed, the court stated that Kurzer had been promised that what he told investigators would not be used against him even if the agents were not satisfied with his cooperation and the agents therefore decided not to have Kurzer testify before the grand jury under a statutory grant of immunity. As the court noted, this informal agreement prevented use of the information obtained from Kurzer during the interview process to the same extent that the formal grant of immunity under section 6002 Kurzer was given when

he testified before the grand jury would prevent use of testimony given under such a grant. *Id.* at 513 n. 3.

Section 6002 provides that when a witness refuses on the basis of his privilege of self-incrimination to testify, he may be ordered to do so. The section continues: "[B]ut no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order." This provision of the statute precludes imposition of a condition upon a grant of immunity under the statute of the kind imposed by the agreement in this case. The reason for the statutory provision is clear. Under the statute the witness is compelled to testify over his claim of a privilege against self-incrimination in return for a grant of immunity. The statute and the testimonial compulsion it authorizes are constitutional only if the immunity granted is .equal to the constitutional protection it supplants. *Kastigar v. United States,* 406 U.S. 441, 449, 92 S.Ct. 1653, 1659, 32 L.Ed.2d 212 (1972).

There is no issue of compelled self-incrimination in this case. Irvine was not required to testify. He testified pursuant to an agreement entered into freely on his own initiative and for his own purposes. Irvine was free to agree to conditions that could not have been imposed upon him had he chosen to claim his Fifth Amendment privilege.

### III.

Irvine contends the bribery and narcotics offenses were improperly joined under Fed. R.Crim.P. 8(a), and the district court abused its discretion when it refused to sever the charges under Fed.R.Crim.P. 14. *See United States v. Friedman,* 445 F.2d 1076, 1082 (9th Cir.1971).

■ Joinder was proper since the solicitation of the bribe and Irvine's drug offenses formed a common scheme to distrib-

ute cocaine and avoid prosecution for it. *See United States v. Brainard,* 690 F.2d 1117, 1126–27 (4th Cir.1982); *United States v. Scott,* 659 F.2d 585, 589 (5th Cir.1981). The courier activities underlying the narcotics offenses for which Irvine was indicted were directed and paid for by Betancourt, the person from whom Irvine solicited the bribe. Betancourt supplied cocaine to Terry Read, with whom Irvine was charged with conspiring from 1980 (the time of the drug offenses) to 1983 (the time of the bribe), and the attempted bribe consisted of Irvine's request that Betancourt supply him with cocaine in return for Irvine's agreement not to testify about these activities.

■ The motion to sever was properly denied since Irvine failed to establish that the joint trial was "manifestly prejudicial". to him. *See United States v. Bronco,* 597 F.2d 1300, 1302 (9th Cir.1979). Irvine's claim of prejudice, because the jury might have improperly cumulated the evidence and considered the drug evidence when it convicted him for bribery, fails because the drug evidence would have been admissible in the bribery trial to show Irvine's intent and ability to solicit the bribe even if there had been separate trials. *Id.* at 1302–03. *See also Brainard,* 690 F.2d at 1127; *Scott,* 659 F.2d at 589. The offered bribe dealt precisely with Irvine's knowledge, acquired while a courier, about Betancourt's narcotics dealings. It occurred during the time encompassed by the narcotics conspiracy. Even if some evidence of the drug offenses might have been inadmissible separately, there is no indication it was not cumulative and harmless. *See United States v. Diaz-Munoz,* 632 F.2d 1330, 1337 (5th Cir.1980).

Moreover, there is no real suggestion that the jurors were confused or misled. The evidence was specific to the crimes, not to Irvine's character, and a jury would not quickly assume that a drug courier would naturally solicit a bribe. *Cf. Bronco,* 597 F.2d at 1303 (prejudice from not severing two instances of counterfeiting); *United*

*States v. Ragghianti,* 527 F.2d 586, 587–88 (9th Cir.1975) (prejudice from not severing. two counts of bank robbery).

AFFIRMED.