**G.D. SEARLE & CO., Searle Pharmaceuticals, Inc. and Searle & Co., Plaintiffs,**

v.

**INTERSTATE DRUG EXCHANGE, INC., and Marvin Sandler, Defendants.**

No. CV–85–1986 (MAC).

United States District Court, E.D. New York.

April 14, 1987.

**496**

Barry R. Fischer, Hall, Dickler, Lawler, Kent & Freedman, New York City, for defendants.

Michael C. Harwood, Audrey Strauss, New York City, for plaintiffs.

## MEMORANDUM AND ORDER

ALLYNE R. ROSS, United States Magistrate.

Plaintiffs, G.D. Searle & Co., Searle Pharmaceutical, Inc. and Searle & Co. ("Searle") seek an order compelling defendant Marvin Sandler to answer questions posed to him at his deposition. In refusing to answer those questions, Sandler asserted a Fifth Amendment privilege against self-incrimination. Plaintiffs urge that the questions, which pertain to Sandler's prior activities in the so-called "diversion market" for the American pharmaceutical industry, meet the test of relevance for purposes of civil discovery under Rule 26(b)(1), Fed.R.Civ.P. Plaintiffs also contend that Sandler, having been granted transactional immunity for his illegal activities in the "diversion market" pursuant to a plea and cooperation agreement with the United States government, has no residual Fifth Amendment privilege to assert regarding these matters. Finally, plaintiffs argue that Sandler in any event has waived any privilege by virtue of testimony he has already given at his deposition in this case.

In resisting the application to compel his testimony, Sandler contests the relevance of plaintiffs' inquiries in the context of the issues in this case, maintains that he possesses a Fifth Amendment privilege regarding his illegal "diversion market" activities notwithstanding his agreement with the government, and denies that any aspect of his deposition testimony can be considered as waiving that privilege. Resolution of these conflicting contentions requires an examination of the factual background, gleaned from the court records in this case and the parties' various submissions on this motion.

### The Diversion Market

Since the questions at issue on this motion concern the "diversion market" in the American pharmaceutical industry, it is appropriate at the outset to identify what that term means. Based upon the parties' submissions, supplemented by recent caselaw, *see United States v. Weinstein,* 762 F.2d 1522, 1527, *modified,* 778 F.2d 673 (11th Cir.1985), *cert. denied,* 475 U.S. 1110, 106 S.Ct. 1519, 89 L.Ed.2d 917 (1986), the "diversion market" may be summarily explained as follows:

█ The Robinson Patman Act, 15 U.S.C. Section 13 *et seq.,* which affects the pricing of goods sold for use or resale within the United States, does not apply to sales of goods for export or to non-profit organizations. Hence, United States pharmaceutical manufacturers often discount the price of their products when they are sold to exporters or charitable entities. If such discounted pharmaceuticals are subsequently resold domestically at a price below the manufacturer's domestic price, those resales are said to be in the "diversion market." That is, the goods have been "diverted" from their originally intended use. While not all transactions in "diverted" pharmaceuticals are unlawful, it is illegal for a purchaser to acquire drugs from a manufacturer by fraudulently misrepresenting their intended use. Similarly illegal is any subsequent purchase on the domestic market by a person who is aware

of the fraudulent means by which the drugs were acquired.

*The Instant Proceeding*

In this proceeding, the Searle plaintiffs, manufacturers of Ovulen birth control pills, brought suit against Interstate Drug Exchange ("IDE") and Marvin Sandler, its Executive Vice President, alleging various violations of the Lanham Trademark Act, as amended by the Trademark Counterfeiting Act, 15 U.S.C. Section 1051 *et seq.* The action arose out of IDE's sale and distribution of approximately one million counterfeit Ovulen pills. Defendants have acknowledged that in October and November of 1983, IDE purchased these pills from Lantor Corporation ("Lantor"), a Florida pharmaceutical wholesaler, and subsequently resold them to other wholesalers who distributed them to retailers in the United States. Defendants, however, maintain that in engaging in these transactions, they did not know that the pills were counterfeit. According to defendants, they purchased the pills from Lantor upon the representation of its principal, Fermin Alfonso, that the pills were genuine Searle products.

At his deposition in this action, Sandler testified, in response to a question by plaintiffs' counsel, that at the time he purchased the counterfeit Ovulen, he "thought that the merchandise [he] was buying from Lantor was merchandise that was in the diversion market." (Sandler Deposition Tr., p. 911). Also at his deposition, on some twenty-five separate occasions, Sandler invoked the Fifth Amendment privilege against self-incrimination in refusing to answer questions concerning his prior involvement in illegal activities in that market (Sandler Deposition Tr., pp. 79, 101, 115, 326, 334, 337, 338, 340, 346, 557, 559, 586, 608, 609, 898, 905, 906, 909, 910, 912).

*The Plea Agreement*

On May 18, 1986, Marvin Sandler entered into a plea and cooperation agreement with the Office of the United States Attorney for the Northern District of Georgia. Pursuant to that agreement, Sandler was permitted to enter a plea of guilty to a single count information charging conspiracy to commit wire fraud (18 U.S.C. § 1343), in violation of 18 U.S.C. § 371, in full satisfaction of all federal criminal liability to which he was exposed for his activities in the illegal "diversion market" of the pharmaceutical industry to that date, conditioned upon his continuing cooperation in the government's ongoing investigation. Because the terms of Sandler's cooperation agreement are of critical importance in resolving the instant dispute, they will be recounted here in detail.

The agreement recited that it was "intended to cover all conduct in connection with [Sandler's] activities in the pharmaceutical industry to date." More specifically, the government agreed "not to bring further criminal charges" against Sandler, IDE or any of its subsidiaries or employees,

> based upon the activities in which Jay Marvin Sandler participated regarding diversion, adulteration and misbranding in the pharmaceutical industry including but not limited to prosecution under 18 U.S.C. Sections 371, 1001, 1341, 1343, 1961, 2341 and 2320, 21 U.S.C. Section 331, the Internal Revenue Cole of 1954, as amended, and other criminal revenue laws of the United States of America, *so long as the nature of such conduct is disclosed in his debriefing by the government, and he fully cooperates with the United States as contemplated by this agreement.* [Emphasis added].

The "cooperation" demanded of Sandler was also specified in the agreement:

> Mr. Sandler is required to respond fully and truthfully to all inquiries of the United States about practices in the pharmaceutical industry and testify fully and truthfully about those matters in any proceeding when called upon to do so by the United States. Further, Mr. Sandler understands and agrees that, upon reasonable notice, he will make himself available to the United States for interviews, and otherwise give the United States access to the knowledge or information he may have regarding the pharmaceutical industry.

The agreement expressly exempted from its coverage any prosecution for perjury or making a false statement under oath (18 U.S.C. §§ 1621, 1623), and it provided that it was intended to have no effect upon the civil tax liability of Sandler or any company with which he was associated. Finally, although the government declined to make any recommendation regarding the appropriate sentence to be imposed, it promised to inform the sentencing judge of "the full nature and extent of [Sandler's] cooperation" in its investigation.

As noted above, pursuant to this agreement, on May 20, 1985, the United States Attorney for the Northern District of Georgia filed the single count Criminal Information charging Sandler with conspiring, between 1981 and April of 1985, to defraud drug manufacturers and the drug consuming public by obtaining pharmaceuticals under false pretenses and "diverting" them for resale at a profit through IDE, in violation of 18 U.S.C. § 371. Also on May 20, 1985, during the course of a proceeding before Magistrate Feldman of the Northern District of Georgia, the parties to the criminal action placed the terms of the plea agreement on the record. In response to an inquiry by the Magistrate regarding whether the agreement was "limited to information that [Sandler] disclosed [to the government] as to criminal activities", the Assistant United States Attorney expressed reluctance even to summarize the terms of the agreement because the "exact language" of the document had been fully and thoroughly negotiated in discussions involving other federal districts. Sandler's attorney, Hugh Peterson, however, offered the following clarification:

> Your Honor, if I might observe it's not the information or the conduct, it's the nature of the conduct.... [T]he agreement not to prosecute further is not basically use immunity based on what he tells but [i]s one [requiring that] he describe[ ] the type of conduct in which he

was involved and answer[ ] the questions truthfully and cooperate[ ] fully. That is his obligation under this plea agreement. That is why it's the nature of the conduct and not just the conduct itself. (Transcript of May 20, 1985 Proceeding, p. 11).

The government did not contest Mr. Peterson's characterization of the agreement.

### Sandler's Cooperation

Thereafter, Sandler cooperated with the government. Although the total extent of his cooperation cannot be ascertained [1], the record discloses the following: Sandler met with representatives of the Food and Drug Administration and was interviewed by representatives of the Department of Justice regarding "diversion activities" in the pharmaceutical industry. In addition, he testified before a federal grand jury and, on July 10, 1986, testified under oath at Congressional hearings before the House Committee on Energy and Commerce, Subcommittee on Oversight and Investigations. The portion of his Congressional testimony which pertained to his illegal activities in the pharmaceutical "diversion market" was given in public session and was nationally televised on cable television.[2]

As part of his testimony, Sandler read an eleven page prepared statement in which he described the scope, volume and duration of his activities in the illegal diversion market, and he identified approximately ten specific transactions as illustrative of the types of illegal transactions in which he had engaged. Thereafter, in response to questioning by committee members, Sandler provided further details of those transactions, specifying the manufacturer of the drugs, identifying the participants involved and explaining the mechanics of each transaction. Throughout his testimony, Sandler highlighted those suspicious circumstances alerting him to the fact that the transaction involved illegally diverted drugs. (See Transcript of July 10, 1986 Testimony before the House Subcommittee on Oversight

---

1. Sandler's attorney has represented that the government's sentencing memorandum in *United States v. Jay Marvin Sandler,* Docket No. 86–119–A, (N.D.Ga. Atlanta Div.), remains under seal in that proceeding.

2. Sandler also testified, in closed session, regarding his transactions in counterfeit Ovulen (Sandler Deposition Tr., p. 905).

and Investigations, Committee on Energy and Commerce).

*The Sentencing*

On June 26, 1986, Sandler appeared before the Honorable Robert L. Vining, Jr., United States District Judge, Northern District of Georgia, for sentencing upon his plea of guilty. As required by the terms of the cooperation agreement, the government had previously provided Judge Vining with a sealed sentencing memorandum detailing Sandler's cooperation. When the Assistant U.S. Attorney then offered to comment orally regarding Sandler's cooperation, Judge Vining interposed that he was prepared to "save [both parties] a lot of worry and maybe a little bit of time" because he had already determined to place Sandler on probation. (Transcript of Sentencing Proceedings dated June 26, 1986, p. 16). Thereafter, Judge Vining suspended Sandler's sentence, placed him on five years' probation, assessed a $150,000 fine and a $50 special assessment and imposed a requirement that he perform community service.

## DISCUSSION

### A. *Relevance*

■ As his first line of defense in opposing plaintiffs' motion, Sandler protests that testimony about the illegal diversion market has no relevance to this lawsuit, which involves not diverted, but counterfeit pharmaceuticals. The argument is not persuasive. A central issue in this suit is whether defendants knew that the Ovulen pills they admittedly purchased and resold were counterfeit. In meeting their burden of establishing defendants' knowledge, plaintiffs understandably assert that they will seek to rely upon any "suspicious circumstances" surrounding IDE's purchase of the pills from Lantor. In light of Sandler's assertion at his deposition that he interpreted those circumstances as indicating a transaction not in counterfeit but in "diverted" drugs, discovery regarding Sandler's expertise in the diversion market can be a significant resource to plaintiffs in testing the truth of Sandler's claim of a mistaken assumption.

The compromise defendants propose—that Sandler's testimony be limited to general testimony regarding the diversion market—may not accomplish the same objective. As Sandler indicated in his Congressional testimony, it is the details of any particular transaction in pharmaceuticals that signal whether the subject drugs have been diverted. Hence, the opportunity to explore the circumstances of individual transactions in diverted drugs for purposes of comparing them with those surrounding the purchase at issue here could measurably assist plaintiffs in probing the veracity of Sandler's asserted belief.

Defendants also offer to eliminate as a possible defense any claim that they thought the drugs were diverted rather than counterfeit. Such an arrangement would not, however, place the requested discovery outside the scope of Rule 26. First, regardless of the good faith of such an offer, if Sandler were called to testify at trial (as he likely will be), it would be virtually impossible to exclude from his testimony any reference to his actual understanding of the nature of the Ovulen transaction. Indeed, Sandler's knowledge of that transaction is the essence of the parties' dispute.

■ Moreover, plaintiffs have stated that they will seek to impeach Sandler as a witness at trial by cross-examining him concerning his prior fraudulent activities in the pharmaceutical industry. Since Rule 608(b) of the Federal Rules of Evidence accords the trial judge broad discretion to permit impeachment of a witness's credibility by eliciting prior conduct probative of veracity, defendants could foreclose the requested discovery at this stage only by securing an *in limine* ruling precluding this line of cross-examination at trial. Short of such a ruling, questions concerning Sandler's activities in the illegal diversion market can reasonably be calculated to lead to the discovery of evidence admissible in this lawsuit. Hence, under the broad test of relevance set forth in Rule 26, Fed. R.Civ.P., such matters are discoverable un-

less privileged, the issue now to be addressed.

## B. *Fifth Amendment Privilege*

The Fifth Amendment privilege against self-incrimination "protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States*, 406 U.S. 441, 445, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972). It can be asserted "in any proceeding, civil or criminal," *id.* at 444, 92 S.Ct. at 1656, but the privilege will not be upheld merely because the person asserting it believes that such assertion is reasonable. "It is for the court to say whether [the] silence is justified", *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951), for to accept Fifth Amendment claims at face value "would leave no check on assertions of the privilege where the risk of incrimination is remote or even non existent". *Camelot Group, Ltd. v. W.A. Krueger Co.*, 486 F.Supp. 1221, 1224 (S.D. N.Y.1980).

To establish entitlement to invoke the Fifth Amendment privilege, the party asserting it bears the burden of demonstrating "reasonable cause to believe that a direct answer would support a conviction or furnish a link in the chain of evidence needed to prove a crime." *Id.* at 1225. Further,

> the privilege against self-incrimination "protects against real dangers, not remote and speculative possibilities." [*Citing Zicarelli v. New Jersey Investigating Commission*, 406 U.S. 472, 478 [92 S.Ct. 1670, 1675, 32 L.Ed.2d 234] (1972).] Thus the Court must be satisfied that given all the circumstances of the case, in connection with each area the questioning party wishes to explore, the claimant of the privilege is "confronted by substantial and 'real', and not merely trifling or imaginary hazards of incrimination." [*Citing, inter alia, Marchetti v. United States*, 390 U.S. 39 [88 S.Ct. 697, 19 L.Ed.2d 889] (1968)].

*Id.* In assessing the validity of an assertion of Fifth Amendment privilege, the court must look to all of the circumstances of the case and "be governed as much by ... personal perceptions of the peculiarities of the case as by the facts actually in evidence." *Hoffman v. United States*, 341 U.S. at 486, 71 S.Ct. at 818. Although the privilege must be accorded liberal application, "the court may order a witness to answer if it clearly appears he is mistaken as to the justification for the privilege or is advancing his claim as a subterfuge." *Camelot Group, Ltd. v. W.A. Krueger Co.*, 486 F.Supp. at 1225.

Sandler urges that he is entitled to assert a Fifth Amendment privilege in refusing to answer all questions pertaining to his illegal activities in the diversion market because his fears of prosecution are real and immediate, not speculative or imaginary. At the outset, in papers originally filed on this issue, Sandler acknowledged that he had no apprehension of state prosecution. Rather, he asserted the privilege based on his contention that his agreement with the United States Attorney's Office for the Northern District of Georgia did not adequately protect him against the possibility of federal prosecution. Thereafter, however, under circumstances described below, Sandler claimed that his assertion of the privilege was grounded on a fear of state prosecution as well, urging that a document plaintiffs produced during discovery in this case provided a basis for that fear. Whether his asserted fears are real or speculative must, of course, be examined by reference to the pertinent facts and circumstances of this case.

### 1. *Fear of Federal Prosecution*

■ As noted, Sandler argues that, notwithstanding his plea and cooperation agreement with the United States government, he is in danger of federal prosecution because the immunity accorded him by that agreement is limited to "those transactions and practices which [he] disclosed to the United States" in his debriefings. Accordingly, Sandler urges, he remains exposed to federal prosecution for any and all matters

not specifically disclosed.[3] His position, however, is premised upon a restrictive reading of the agreement which finds no support in either the language of the document or the parties' interpretation of its terms.

By its terms, the agreement accords Sandler an unusually broad grant of transactional immunity. The agreement recites that it is "intended to cover all conduct in connection with [Sandler's] activities in the pharmaceutical industry to date ... so long as *the nature of such conduct is disclosed in his debriefing* by the government, and he fully cooperates with the United States as contemplated by this agreement." (Emphasis added). The phrase, "the nature of such conduct", suggests that the parties intended that particular illegal acts not specifically disclosed in the debriefing would be immunized—"so long as the nature of such conduct [was] disclosed."

This interpretation is supported by the colloquy before Magistrate Feldman when the terms of the agreement were first formally placed on the record. As indicated above, the Assistant United States Attorney emphasized the care the parties had exercised in selecting language to express their intentions. Moreover, Sandler's attorney indicated that the parties had adopted the phrase "nature of the conduct" rather than the term "conduct" because they intended the immunity to cover all transactions falling within the "type of conduct" Sandler disclosed in his debriefing. The government's representative did not qualify or dispute this interpretation.

Moreover, the evidence adduced regarding the course of Sandler's cooperation with the government suggests that he has met his obligations under the agreement. He participated in government debriefings, offered testimony before the grand jury and gave sworn, nationally-televised testimony before a Congressional subcommittee during which he was examined concerning a plethora of illegal transactions in diverted pharmaceuticals. Significantly, too, al-

though the memorandum presented by the government at Sandler's sentencing is not available for consideration here, the probationary sentence ultimately imposed by Judge Vining provides some indication that the government favorably assessed his cooperation under the agreement. Such a conclusion is reinforced by the judge's remarks, quoted above, just prior to sentencing. Finally, there is nothing in the materials presented by the parties suggesting that Sandler was in any way deceitful or evasive in his dealings with the government or that he failed to adhere to his commitments under the agreement. To the contrary, everything in the record supports the conclusion that he has been candid and forthcoming, and that the government is satisfied with his cooperation to date. In short, the record here virtually compels the conclusion that Sandler could not and would not be prosecuted federally for any criminal activity disclosed by the testimony plaintiffs seek.

Defendant's arguments to the contrary are bottomed on acknowledged conjecture. Initially, Sandler theorizes that the deposition testimony plaintiffs seek will of necessity depart from his Congressional testimony, providing the government with a ready pretext to declare the agreement void and prosecute him for all of the underlying offenses. Quite apart from the speculative nature of that claim, it is founded on at least two unstated assumptions: first, that Sandler could be subjected to criminal prosecution based on the government's unilateral declaration that he was in breach of his cooperation agreement; and second, that any perceived inconsistency between his deposition and Congressional testimony would justify such a declaration of breach. Both assumptions are flawed.

It is beyond dispute that "when a plea rests in any significant degree on a promise or agreement of the prosecutor, ... such promise must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971). Hence, if the

---

**3.** Sandler does not contend that the *list* of federal crimes for which the agreement grants him immunity is not an exhaustive one. Rather his argument focuses on the breadth of the conduct immunized and his fears that the agreement will not remain in force.

government, as part of a plea and cooperation agreement, promises to dismiss or to forbear from bringing certain criminal charges, the government is bound by that promise. The beneficiary of the promise may not be exposed to prosecution for any charge covered by the agreement. From these principles, it follows that the beneficiary loses any privilege against self-incrimination with respect to charges covered by the agreement. *See United States v. Pardo*, 636 F.2d 535, 543 (D.C.Cir.1980) ("Since [such] promises ... are binding on the Government, a witness may not be exposed to prosecution on those charges, and the need for the privilege is lost." *Id.*)

As Sandler urges, it is likewise "clear that a defendant's failure to fulfill the terms of a [plea or cooperation] agreement relieves the government of its reciprocal obligations under the agreement." *United States v. Calabrese*, 645 F.2d 1379, 1390 (10th Cir.), *cert. denied*, 454 U.S. 831, 102 S.Ct. 127, 70 L.Ed.2d 108 (1981). Hence, a defendant who breaches the terms of his agreement could lose the transactional immunity otherwise accorded him, and again be subject to prosecution for the underlying offenses. Contrary to Sandler's assumption, however, "[t]he question of a defendant's breach is not an issue to be finally determined unilaterally by the government." *Id.* Rather, it must be determined judicially, based on adequate evidence, in a proceeding in which the government bears the burden of establishing a material breach by the defendant. *Id. See also, United States v. Brown*, 801 F.2d 352, 355 (8th Cir.1986); *United States v. Carrillo*, 709 F.2d 35, 36–37 (9th Cir. 1983); *United States v. Brimberry*, 744 F.2d 580, 587 (7th Cir.1984).[4]

Here, Sandler has offered no reason to suppose that the government might declare him in breach of the agreement, much less that a court would ratify such a unilaterial pronouncement of breach. The sole concern he expresses in his papers is that

"methodical and comprehensive" questioning at his deposition might elicit facts and details not disclosed in his previous testimony. However, it is not reasonable to expect that this type of discrepancy, absent some indication of intentional concealment or falsehood, would be viewed by a neutral decision maker as evidencing a breach warranting abrogation of the agreement. This is especially so in light of the substantial burden the government must meet to establish a material breach rendering the agreement unenforceable. *See United States v. Brown*, 801 F.2d at 355; *United States v. Carrillo*, 709 F.2d 35, 36–37; *United States v. Calabrese*, 645 F.2d at 1389–1390.

Nor does the record here suggest any basis for presuming that Sandler lied in his previous Congressional or grand jury testimony. Sandler is correct in pointing out that even if a witness cannot be prosecuted for the underlying substantive crime, his testimony might nonetheless provide incriminating evidence in regard to a possible perjury charge stemming from testimony given under oath in a prior proceeding. *See In Re Morganroth*, 718 F.2d 161 (6th Cir.1983). To justify invoking a Fifth Amendment privilege where the claimed risk of prosecution relates to perjury, however, the witness must adduce evidence showing "a real danger of prosecution." Unless "a court can, by the use of reasonable inference or judicial imagination, conceive a sound basis for a reasonable fear of prosecution," this threshold showing has not been met. *Id.* at 169.

Here, the record supplies no support for the assumption that Sandler's truthful testimony might provide evidence that his former testimony was false. As in *Morganroth*, there is no indication of "conflicting testimony by other witnesses or contradictory documentary evidence which might tend to show that [Sandler] perjured himself in [the prior] proceeding." *Id.* Nor, as in *Morganroth*, did Sandler "apprise ... the court that his testimony or deposition

---

4. In such proceedings, courts look to contract law analogies in interpreting concepts of materiality and breach. *See United States v. Baldacchino*, 762 F.2d 170 (1st Cir.1985); *United States v. Irvine*, 756 F.2d 708, 710 (9th Cir.1985); *United States v Carrillo*, 709 F.2d 35, 36 (9th Cir. 1983).

answer would differ from statements given in the earlier proceedings." *Id.* Finally, as in *Morganroth,* the sole basis of the asserted fear of a perjury prosecution is the fear stated by Sandler's attorney that there is the possibility of significant discrepancies between Sandler's proposed testimony and his prior testimony. (Defendants' October 3, 1986 letter, p. 9.) However, as the *Morganroth* Court aptly observed, "[t]his possibility ... exists in every case in which a witness has given prior testimony." 718 F.2d at 169.

> Public policy ... requires that a witness bear the burden of establishing the foundation of the privilege beyond his mere "say so." Unless something more is required in situations such as the one [here] ..., witnesses ... will be the final arbiters of the validity of their asserted privileges. A litigant's right to information must be balanced against a witness' constitutional right to invoke the privilege. Only where there is some real danger can the loss of information to a litigant or to the judicial system be justified.... [citation omitted]. In addition, unless some additional showing beyond the mere assertion of the privilege is required, no witness would ever have to testify twice regarding the same subject matter because the possibility of perjury would always exist in theory.

*Id.* at 170. In short, if Sandler's asserted fears of prosecution arise from the possibility that he might have previously lied under oath, he has failed to establish the requisite foundation to assert the privilege on this ground.

There may well be situations in which a witness, although accorded transactional immunity as part of a plea and cooperation agreement, may nonetheless in a separate proceeding validly invoke a Fifth Amendment privilege against self-incrimination regarding matters ostensibly covered by the immunity agreement. But that is not the case here. Nothing in this record supports the claim that Sandler's asserted fears of federal prosecution are anything other than

trifling or imaginary. According, his assertion of the privilege on this ground must be rejected.

### 2. *Fear of State Prosecution*

■ The issue posed by Sandler's claim of Fifth Amendment privilege based on his fear of state prosecution is presented here in an unusual posture. As noted above, in all papers he originally submitted in support of his Fifth Amendment claim, Sandler urged only that his testimony regarding his activities in the diversion market created a risk of self-incrimination in connection with possible federal prosecution. He affirmatively disavowed any fear of state prosecution.[5] It was not until six weeks after all motion papers had been submitted that Sandler first asserted a concern about state prosecution as a basis for invoking the privilege.

Specifically, in their December 2, 1986 letter (at p. 2), defendants related that on the previous day, plaintiffs had produced as part of discovery an "undated" report of plaintiffs' private investigator, Intertel, indicating that the Nassau County police were "trying to develop a prosecutable criminal case against defendant Interstate Drug Exchange and by implication defendant Sandler" and that "Intertel (and thus, plaintiffs) is actively assisting the Nassau police in that investigation." Relying solely upon the contents of this report, defendants asserted that "Mr. Sandler does indeed face the risk of state prosecution and, therefore, should have asserted such prosecution as a separate and independent basis for his Fifth Amendment privilege".

In their submission of January 8, 1986 (at p. 6–7), defendants reaffirmed that the contents of the Intertel memorandum constituted the sole underpinning of this claim. Specifically, they again acknowledged that, absent the Intertel memorandum, "they had no basis" to assert the privilege on the ground that they feared state prosecution, as "they had no facts supporting" such a claim.

---

**5.** In their October 3, 1986 letter to Magistrate A. Simon Chrein (p. 7, n. 1), defendants stated: "Sandler acknowledges that his basis for assert ing his Fifth Amendment claim arises out of a concern for federal rather than state prosecution."

Thus, the issue posed by Sandler's invocation of the privilege based on his asserted apprehension of state prosecution is a narrow one. Having repeatedly acknowledged that the Intertel memorandum provides the exclusive basis for Sandler's claim, defendants have limited the question here to whether or not the contents of that document satisfy Sandler's burden of establishing a reasonable fear of state prosecution based on the testimony plaintiffs seek.

The Intertel memorandum annexed to defendants' December 2, 1986 letter, entitled "Summary of Intertel Activities", is dated December 14, 1984 [6]. It is a report of Intertel investigators, apparently to Searle, regarding the progress of their inquiries into the incidents involving the distribution of counterfeit Ovulen. Specifically, the memorandum reports certain seizures of counterfeit Ovulen, refers to investigations regarding the "envelope die" used in producing packaging for the counterfeit drugs, and relates the details of an interview with Fermin Alfonso, the individual who sold defendants the counterfeit products they are charged in this lawsuit with distributing. The memorandum also relates the status of various federal and state investigations into the counterfeiting incidents—indicating, specifically, that the federal Food and Drug Administration was preparing to present the case to the Office of the United States Attorney in Miami, Florida, and that

> Nassau County, New York detectives are pursuing the investigation of Interstate Drug Exchange and Interstate Cigar Company [the distributor of a second lot of counterfeit Ovulen]. They hope to develop a prosecutable case against them.

Nowhere does this memorandum refer to any activity in the illegal diversion market in pharmaceuticals, much less suggest that the Nassau County investigation, identified as one pertaining to counterfeit Ovulen, encompassed illegal diversion activities as well.[7]

Focusing on the issue posed here, Sandler has asserted a Fifth Amendment privilege in refusing to answer questions concerning illegally diverted pharmaceuticals, claiming fear of state prosecution for his activities in this area. The memorandum he cites as generating that fear, however, has nothing at all to do with those matters about which he claims to be apprehensive. Indeed, the memorandum and the Nassau County investigation it discloses focus narrowly on the distribution of counterfeit pharmaceuticals, the very incidents that form the basis of this lawsuit and about which Sandler has willingly testified at his deposition. In short, Sandler's sole ground for asserting the instant claim is unrelated to the activities about which he refuses to testify.

While conceding that "the Intertel reports speak only of a criminal investigation in connection with the counterfeit Ovulen transactions which give rise to this lawsuit" (Defendants' December 9, 1986 letter, p. 3), Sandler contends that he genuinely fears state prosecution because that investigation might "spill over" into an investigation of criminal offenses relating to diversion. As defendants express it, "no one can predict where [the Nassau County] investigation might lead." (Defendants' December 9, 1986 letter, p. 4). In the circumstances presented here, however, the "spillover" possibilities defendants invoke are simply too remote to justify upholding assertion of the privilege on this ground.

It is undisputed that the memorandum on which defendants rely recites that the state investigation concerned counterfeiting, not diversion. Moreover, that memorandum is dated in late 1984, more than two years ago, and there is nothing in the record to suggest that the Nassau County

---

**6.** On December 8, 1986, plaintiffs supplied a dated copy of this memorandum.

**7.** A second Intertel memorandum, dated November 16, 1984, was also annexed to defendants' December 2, 1986 submission. This memorandum, too, addresses Intertel's investigative activities in connection with the counterfeiting incidents. While it makes passing reference to "diversion in Panama", there is no suggestion that information regarding diversion was provided to state authorities.

investigation was ever pursued. Indeed, plaintiffs have represented that, according to their investigation, Nassau County ceased its investigation into the counterfeit Ovulen incident, deferring to the federal grand jury investigation conducted by the Department of Justice and the United States Attorney's Office in Miami, Florida;[8] and defendants have not disputed the accuracy of that representation. Thus, the sole foundation of defendants' asserted fear of state prosecution is the "possibility of spillover" from an investigation into separate and distinct criminal activity, which investigation has long since terminated.

As defendants correctly point out, the Second Circuit has admonished that in assessing the validity of a Fifth Amendment claim, " '[o]nce the court determines that the answers requested would tend to incriminate the witness, [that is, once the court is satisfied that the witness has met this threshold burden], it should not attempt to speculate whether the witness will in fact be prosecuted.' " *United States v. Edgerton,* 734 F.2d 913, 921 (2d Cir.1984), *quoting, United States v. Jones,* 703 F.2d 473, 478 (10th Cir.1983); *see also ACLI Intern. Commodity v. Banque Populaire Suisse,* 110 F.R.D. 278 (S.D.N.Y.1986). But that admonition does not support defendants' position here. Defendants have

acknowledged that their sole ground for asserting that "the answers requested would tend to incriminate" Sandler in a possible state prosecution is the fact of the Nassau County investigation they learned of in discovery. Having advanced the Nassau County investigation as their only basis to satisfy their threshold burden, defendants cannot at the same time insulate from scrutiny the question whether that investigation is a valid basis on which to assert the privilege.[9]

The conclusion that Sandler has no genuine fear of state prosecution is consistent with the fact that in July of 1986, he gave nationally broadcast testimony before a Congressional subcommittee detailing his illegal activities in the pharmaceutical diversion market over a five year period ending in 1985. (See above at 8–9). Although he knew that state prosecutors were not legally barred from using that testimony to prosecute him for any state crimes arising from his activities, he testified without asking Congress to confer on him a statutory grant of use immunity. Having thus displayed his confidence that no state would prosecute him for the activities about which he testified, Sandler's original disavowal of any fear of state prosecution is unsurprising.[10]

8. In this regard, plaintiffs submitted the affidavit of their attorney, Michael Harwood, Esq., dated December 16, 1986, relating the representation of John Harrington, the Nassau County Police Department Detective who conducted the noted investigation, that the local investigation had been closed and all information gathered had been turned over to federal authorities in Miami, Florida for use in the federal investigation.

9. Plaintiffs also argue that the New York State statutory protections against double jeopardy in C.P.L. § 40.20, barring a New York prosecution for any acts which could have been proved as part of a federal conspiracy charge to which a defendant pleaded guilty, protect Sandler against a New York prosecution. While past caselaw on the whole supported this view, *see People v. Abbamonte,* 43 N.Y.2d 74, 84, 400 N.Y.S.2d 766, 371 N.E.2d 485 (1977); *see also People v. Vera,* 47 N.Y.2d 825, 418 N.Y.S.2d 575, 392 N.E.2d 562 (1979); *cf. People v. Lieberman,* 79 A.D.2d 175, 436 N.Y.S.2d 12 (1st Dept.1981), the 1984 addition of Subsection "g" to C.P.L. § 40.20 makes such a conclusion less certain.

C.P.L. § 40.20(g) permits a New York State prosecution for "a consummated result offense ... which occurred in [New York where] the offense was the result of a conspiracy, facilitation or solicitation prosecuted in another state." Plaintiff argues that a New York State prosecution of Sandler is barred notwithstanding this amendment, for if the legislature had intended to discard the fundamental holding of *People v. Abbamonte,* it would not have limited the amendment to "consummated result offenses". (*See* Plaintiffs' letter of January 5, 1987, p. 2). While this argument is persuasive, because the language of the amendment is not entirely unambiguous and because New York State courts have yet to construe it, one cannot conclude with certainty that a prosecution would not be permissible under C.P.L. § 40.20(g).

10. Sandler's justifications for disregarding his Congressional testimony in this context are not persuasive. While Sandler's refusal to give Congressional testimony absent a statutory grant of use immunity would presumably have constituted a breach of his plea and cooperation agree-

Finally, in light of the circumstances of this case detailed above, defendants' reliance on *ACLI Intern. Commodity v. Banque Populaire Suisse*, 110 F.R.D. 278, is misplaced. As plaintiffs point out, *ACLI Intern.* reaffirmed that a claim of Fifth Amendment privilege will not be sustained unless the witness asserting it establishes that "the danger of self-incrimination ... [is] real and not merely imaginary or hypothetical," *Id.* at 282. That case also recognized that "[a] witness may be compelled to testify if it clearly appears that his claim of privilege is advanced as a subterfuge," *id.* at 283, *citing Camelot Group, Ltd. v. W.A. Krueger Co.*, 486 F.Supp. at 1225.

Here, it is evident from the "peculiarities of [this] case", *Hoffman v. United States*, 341 U.S. at 487, 71 S.Ct. at 818, that Sandler's fears of testifying about his activities in the pharmaceutical diversion market have been engendered not by any realistic prospect of self-incrimination in connection with possible state prosecution, but rather by concerns regarding civil liability in this lawsuit. Having affirmatively acknowledged that the sole basis of his fear of state prosecution is a memorandum concerning a terminated state investigation into separate and distinct matters with respect to which he has not asserted a Fifth Amendment privilege, and having given nationally broadcast testimony on this subject without seeking any protection against state prosecution, Sandler has failed to meet his burden of demonstrating circumstances justifying his claimed fear. Accordingly, his assertion of the Fifth Amendment privilege on this ground, too, must be rejected.[11]

ORDER

For the foregoing reasons, it is hereby ordered that Marvin J. Sandler answer each question posed to him at his deposition which he previously refused to answer on the grounds of a Fifth Amendment privilege. Any future claims of Fifth Amendment privilege interposed by Sandler at his deposition in this proceeding will be determined in accordance with the principles set forth above. On the current record, it would appear that Sandler has no Fifth Amendment privilege to refuse to answer any questions pertaining to his activities in the "diversion market" of the American pharmaceutical industry at any time prior to May 18, 1986, the period covered by his immunity agreement. The validity of any such assertion of privilege will, however, be assessed in light of the state of the record at that time.

---

ment with the Federal government, nothing in that agreement precluded him from requesting such immunity, and there is no reason to believe that such a request would have jeopardized his status as a cooperating defendant. Yet there is no indication that Sandler ever made that request. Further, although Sandler is correct that his Congressional testimony does not constitute a waiver of his right to assert a Fifth Amendment privilege in this proceeding, it does not follow that his "Congressional testimony is irrelevant to his Fifth Amendment rights in this proceeding." (Defendants' December 2, 1986 letter, p. 3). To the contrary, Sandler's willingness to give nationally broadcast testimony regarding his illegal activities in the pharmaceutical diversion market without so much as seeking use immunity to protect against self-incrimination in the context of state prosecution underscores his lack of concern regarding state prosecution of those activities.

**11.** In view of the conclusion that Sandler's assertion of the Fifth Amendment privilege cannot be upheld, it is unnecessary to reach the question whether any aspect of his deposition testimony constituted a waiver of that privilege.