**UNITED STATES of America, Plaintiff,**

**v.**

**Byron T. BROWN and Truett W. Brown, Defendants.**

**No. CR90–353 PHX–EHC.**

United States District Court, D. Arizona.

May 6, 1991.

Wallace H. Kleindienst, First Asst. U.S. Atty., Frederick R. Petti, Kenneth Lowrie, Asst. U.S. Attys., Phoenix, Ariz., for plaintiff.

A. Melvin McDonald, Phoenix, Ariz., Gregory Diskant, Patterson, Belknap, Webb & Tyler, New York City, for defendants.

## ORDER ON MOTION TO DISMISS THE INDICTMENT AND TO RESCIND THE NON–PROSECUTION AGREEMENT

COUGHENOUR, District Judge, Sitting by Assignment.

### I. Background

This case involves the indictment of Byron "Bud" Brown on charges of conspiracy, money laundering, currency structuring, and making false statements on treasury forms. The government charges, in essence, that beginning in February 1989, Mr. Brown engaged in a series of financial transactions designed to launder and conceal from the government and others the profits Mr. Brown made from the sale of the Big Boquillas Ranch to the Navajo Nation.

Mr. Brown and his brother Truett were indicted October 11, 1990. On December 7, Mr. Brown filed a motion to dismiss the indictment, on the basis that it violates his non-prosecution agreement with the government. The government responded on February 8 with a motion to rescind that agreement.

### II. Facts

This prosecution is yet another aftershock of the Big Boquillas ranch scandal of 1987. The key participants in the ranch transaction included Mr. Brown, Peter MacDonald, Sr., and Tom Tracy. Peter MacDonald, Sr., was then Chairman of the Navajo Tribal Council. He had held the position between 1972 and 1982, and then regained it in 1986. Mr. Brown is a real estate agent from Scottsdale, who has known Peter MacDonald, Sr., since the early seventies, and who helped MacDonald in his 1986 campaign. Tom Tracy is a Phoenix businessman, apparently familiar with oil and gas development.

### A. *The Big Boquillas Ranch Sale*

The Big Boquillas ranch is a half-million acre site in Northern Arizona. Around the time that Chairman MacDonald was elected, the three men began discussing the possibility of selling the ranch to the Navajos, at a price ensuring a substantial personal profit to all three. Mr. Brown and Mr. Tracy obtained an option to purchase the ranch from Tenneco West for $26,250,-000. After negotiations with the Navajos, who were heavily influenced by Chairman MacDonald, the Tribe agreed to purchase the ranch for $33,417,386. The actual transactions occurred over two days in July of 1987: On July 8, Mr. Brown and Mr. Tracy exercised their option on the ranch; the next day, they sold it to the Navajos. Mr. Brown's profit allegedly exceeded $4,600,000, of which a substantial portion was to go to Chairman MacDonald. Mr. Brown estimates his profit at $3,000,000.[1]

---

1. The exact amounts involved are not complete- ly clear. Apparently, the deal was initially

Government's Motion to Rescind, Exhibit B (Proceedings before Senate Select Committee on Indian Affairs, 166 (February 7, 1989)) [hereinafter "Senate Transcript"].

Mr. Brown encouraged Chairman Mac-Donald to get involved in the Big Boquillas deal by promising Mr. MacDonald he would be "taken care of." Senate Transcript at 145. At the outset, he took the Chairman and his family to Hawaii for a vacation shortly after the election. Then there were two more direct payments that served as inducements. First, he arranged to wire $25,000 to a New Mexico bank to reduce a note for Mr. MacDonald.[2] Second, he arranged to lease a BMW for Mr. Mac-Donald.[3]

After the deal closed, there were direct and indirect payments to Chairman Mac-Donald. Most significant were a series of cash payments to the Chairman, generally in $5,000 increments, made between about June of 1987 (when the Navajo Nation made its down payment) and December of 1987. Mr. Brown has testified that there were seven to ten of these payments, totalling about $50,000. Brown Deposition of January 11 at 140; Senate Transcript at 159. The payments were made always

upon requests from the Chairman or his son, Peter ("Rocky") MacDonald, Jr., and were always in cash. Because Chairman MacDonald believed his phones were being tapped after the land purchase, he and Mr. Brown referred to the payments in code, as "golf balls." Senate Transcript at 158.

### B. The Federal Investigations and the Immunity Agreement

Several months after the Big Boquillas deal, the FBI and a federal grand jury began an investigation of Peter Mac-Donald, Sr. In 1988, the U.S. Senate Select Committee on Indian Affairs began its own investigation. Senate counsel sought Mr. Brown's testimony, and procured an order from the U.S. District Court for the District of Columbia granting Mr. Brown "use immunity" for his testimony.[4] *Senate Select Committee on Indian Affairs*, Misc. No. 88–312, (D.D.C. October 12, 1988) (order granting use immunity); *see* 18 U.S.C. §§ 6002, 6005. Mr. Brown was deposed on November 14 and 15, 1988, by Kenneth Ballen, counsel for the Senate Select Committee. At these depositions, Mr. Brown described the substance of the Big Boquillas deal, the $25,000 wire transfer, the

---

planned as a three-way split, with Chairman MacDonald's third passing through Mr. Brown. But Mr. Tracy owed Mr. Brown some $750,000 or $850,000 (on an unrelated matter), so Mr. Brown and Chairman MacDonald apparently agreed that MacDonald would not take a full third. Government's Motion to Rescind, Exhibit A, 134–35 (Deposition of Byron Brown (January 11, 1989)) [hereinafter "Brown Deposition of January 11"]; Senate Transcript at 147. Moreover, the three-way split was renegotiated at the last minute, when Mr. Tracy insisted that he had another buyer on hand, and that Mr. Brown and Chairman MacDonald would have to accept 59%, rather than 66% of the profits. Senate Transcript at 166. In his testimony before the Senate, Mr. Brown stated that he had, after taxes and other deductions, a total of $1.7 to 1.8 million, of which he expected to pay the Chairman $500,000 to $750,000. Senate Transcript at 156. The Chairman ultimately received only about $50,000 of this, by way of cash payments. Senate Transcript at 159.

2. The promissory note was held by the United Bank of Gallup, in New Mexico. Mr. Brown did not pay the note himself. Rather, he contacted Mr. Tracy, who had cash available, and Mr. Tracy wired the funds directly to the account. The $25,000 was then listed as an expense in the

Big Boquillas transaction. Senate Transcript at 147–149; Brown Deposition of January 11 at 132–25; Government's Motion to Rescind, Exhibit C, 6–8, 17–20 (Deposition of Byron Brown (November 14–15, 1988)) [hereinafter "Brown Deposition of November 14–15"].

3. This transaction also involved Mr. Tracy, who knew a dealer named Wayne James. Mr. Tracy made the down payment and both Mr. Brown and Mr. Tracy made lease payments. Later, the car was given to the Chairman's son, Peter Mac-Donald, Jr., at least in part to obscure the relationship between the Chairman and Brown. Senate Transcript at 150–152, 162–164, 174; Brown Deposition of November 14–15 at 29–35.

4. The testimony of Kenneth Ballen and Stephen McNamee indicates that the U.S. Attorneys were consulted prior to the grant of use immunity. Although the U.S. Attorney's office cannot effectively prevent the Senate from obtaining such immunity, Mr. Ballen apparently sought general approval of the immunity grant. The U.S. Attorney's office was most concerned that the Senate might seek immunity for Peter MacDonald, Sr.

lease of the BMW, and Peter MacDonald, Sr.'s attempt to suborn perjury.[5] Mr. Brown did not state, at that time, that he had paid Chairman MacDonald after the transaction, and he specifically denied making any payments other than the $25,000 and the BMW.[6]

After his initial depositions, Mr. Brown agreed to wear a wire and meet further with Mr. MacDonald, to get incriminating statements from him. Mr. Brown surreptitiously recorded a conversation with Chairman MacDonald on November 22, 1988. The U.S. Attorney was not involved in these activities. However, after this tape provided valuable statements, Senate counsel sought more cooperation from Mr. Brown. At this point, Mr. Brown and his attorney, A. Melvin McDonald, began seeking "transactional immunity," which may be granted only by the U.S. Attorney. Mr. Brown was interested in the broader protection afforded by such immunity. Senate Counsel was concerned that, without such immunity, its own investigation could be compromised. Accordingly, Mr. Ballen discussed the matter with Stephen McNamee, then U.S. Attorney,[7] and Mr. McDonald, to negotiate this issue. Government's Motion to Rescind at 10. The government admits that Mr. McNamee was "obliquely advised" of the nature of Mr. Brown's November deposition and the recorded conversation between Mr. Brown and the Chairman.[8] Ultimately, the U.S. Attorney's office entered into a non-prosecution agreement with Mr. Brown. Letters from Allen Stooks to Mr. McDonald (December 13, 1988).[9] The agreement, discussed in more detail below, provided that the government would not seek restitution of Mr. Brown's profits on the Big Boquillas deal. Government's Motion to Rescind at 11–13.

After obtaining transactional immunity in a non-prosecution agreement, Mr. Brown engaged in numerous taped conversations with MacDonald and other involved parties. The value of this cooperation is contested. According to the government, Mr. Brown avoided the issue of the payments made out of the profits of the sale, and did not obtain significantly incriminating evidence from the Chairman or others. Other witnesses, including Mr. Ballen and Robert Rothstein, Special Prosecutor for the Navajo Nation, state that Mr. Brown's cooperation and testimony were very significant in removing the Chairman from power and obtaining criminal convictions of the Chairman and his son.

In January, Mr. Brown met with Senate investigators again, in order to recant and alter some of his testimony. As Mr. Ballen testified, this meeting was the result of an unusual set of events. Mr. Ballen deposed Mr. MacDonald, Jr., in early January, 1989, after Mr. MacDonald, Jr. had obtained use immunity. Initially, Mr. MacDonald testified in a manner consistent with the cover-

---

5. In an effort to cover up the $25,000 payment on the Chairman's note at the New Mexico bank, the parties had developed a rather elaborate set of faked transactions, which were designed to make it appear the Peter MacDonald, Jr., had obtained the money from Mr. Brown in exchange for future consulting services, delivered Mr. Brown a promissory note for it, and then deposited the funds in his father's account. Brown Deposition of November 14–15 at 22, 70–74, 79–84. Many of the details of the cover-up story emerged after the November deposition, when Mr. Brown, wearing a wire, met with the Chairman at the Senate investigators' request. *See* Senate Transcript at 169–172.

6. In an interview with the FBI on December 9, 1988, (part of the U.S. Attorney's investigation) Mr. Brown similarly denied making other payments to the Chairman. *See* Government's Motion to Rescind, Exhibit E at 4 (Report of Agent Proctor Lescoe (December 21, 1988)).

7. Stephen McNamee is now a United States District Judge for the District of Arizona. Based on his expressed wishes at the evidentiary hearing of April 29–30, 1991, he is not referred to herein by his title.

8. Mr. McNamee testified that the information passed to him by Mr. Ballen may have tainted the U.S. Attorney's investigation.

9. The parties agree that the main non-prosecution document, while dated December 13, was executed on December 12. The letter of December 13 is a follow-up document in which Mr. Stooks expressly states the government's agreement that it will not prosecute Mr. Brown in a civil suit for the Big Boquillas sale proceeds, and that it will not assist the Navajos in a civil suit against Mr. Brown.

up story that had been revealed by Mr. Brown in testimony and in the November 22 tape. Mr. Ballen informed Mr. Mac-Donald's attorney of the likelihood that his client was not being truthful. After the attorney and client conferred, Mr. Mac-Donald began his deposition again and gave truthful testimony. During this deposition, Mr. MacDonald revealed the "golf ball" payments Mr. Brown had made to Mr. MacDonald, Sr.

Armed with this information, Mr. Ballen approached Mr. Brown's attorney, Mr. Mc-Donald, and the two arranged for a second deposition with Senate counsel. In his deposition of January 11, 1989, Mr. Brown described, for the first time, the "golf ball" payments to the Chairman, and the three-way split of profits that the parties had intended. No one from the U.S. Attorney's office was present; Mr. Brown was questioned by Mr. Ballen and Sedwick Sollers, another Senate attorney. At the close of the deposition, Mr. Ballen stated that Mr. Brown's earlier untruthful statements

> have not substantially affected this proceeding as it .is an ongoing proceeding and there will be Senate hearings to follow ... [T]he declarations made today by Mr. Brown have been made when it had not become manifest that the previous declarations made by him on November 14 were in any fashion inaccurate.

Brown Deposition of January 11 at 150.

Mr. Brown testified before the Senate Select Committee about a month later, on February 7, 1989. In the meantime, Mr. Brown's attorney notified the U.S. Attorney's office of both the fact and the substance of the changes to Mr. Brown's testimony. First, Mr. McDonald spoke directly to Mr. McNamee about the cash payments having been revealed in the deposition. Second, Mr. McDonald sent a transcript of the deposition to Allen Stooks, the Assistant U.S. Attorney in charge of the investigation under U.S. Attorney McNamee. Mr. Stooks states that he never received nor read this transcript. If he did receive

it, he likely sent it to Richard Knauss in the Tucson office of the U.S. Attorney. The transcript is now unaccounted for and apparently lost.[10] Further, Mr. McNamee, and perhaps Mr. Stooks, were contacted by Mr. Ballen and notified of the changes to Mr. Brown's testimony.

Mr. McNamee, after speaking to Mr. Mc-Donald and Mr. Ballen, instructed the members of the U.S. Attorney's office to shield themselves from Mr. Brown's new testimony, to avoid news media reports, and to not watch Mr. Brown's televised testimony before the Senate Select Committee. Mr. McNamee acted out of concern for the case against Peter MacDonald, Jr. He feared that Mr. Brown's new testimony would be interpreted as derivative of Rocky MacDonald's use-immunized testimony, and that it would therefore impermissibly taint the government's investigation of Rocky MacDonald. Therefore, the Assistant U.S. Attorneys, while conceding that they were on notice of Mr. Brown's new testimony, take the position that individual members were not made aware of the substance of that testimony until other sources revealed it much later. Specifically, Mr. Stooks states that he was first notified of the "golf ball" payments when he deposed Peter MacDonald, Jr., in August of 1989. And Mr. McNamee states that Mr. Mc-Donald did not mention the three-way split issue during the telephone conversation, so he was not aware of this until it was revealed in plea negotiations with Chairman MacDonald sometime in the spring of 1989.

### C.  The Navajo Nation's Trial

The Navajo Nation conducted its own investigation into the Big Boquillas deal, which culminated in criminal charges against Chairman MacDonald and Rocky MacDonald. *See* Defendant's Memorandum in Opposition to Government's Motion to Rescind, Exhibit 18, 1 (Affidavit of Robert Rothstein (February 26, 1991)) [hereinafter "Rothstein Affidavit"]. Robert Rothstein, serving as Chief Special Prosecutor

---

**10.** The Court notes that the Tucson office apparently was not searched until the evening of

April 29, 1991.

for the tribe, sought the testimony of Mr. Brown. After he was subpoenaed, Mr. Brown's attorney contacted the U.S. Attorney's office to determine if the agreement obligated Mr. Brown to testify. Defendant's Memorandum, Exhibit 17, 16–17 (Supplemental Affidavit of A. Melvin McDonald (March 7, 1991)) [hereinafter "McDonald Supplemental Affidavit"]. When there was no response, Mr. McDonald indicated his belief that the agreement obligated his client to testify. *Id.* at 17–18. However, Wallace Kleindienst, the current Assistant U.S. Attorney handling the case, then told Mr. McDonald that the agreement did not require Mr. Brown to cooperate with the Navajos. Letter from Wallace Kleindienst to Mel McDonald, (October 24, 1990).

Mr. Brown ultimately refused to testify without a grant of immunity from the Navajo District Court. *See Navajo Nation v. Peter MacDonald, Sr.,* No. WR–CR–3617–3614–89 (Dist. of Window Rock Nov. 21, 1990) (Order Granting Immunity). According to Mr. McDonald, Mr. Brown insisted on immunity to protect him from the U.S. Attorney's use of his testimony against him. After receiving immunity, Mr. Brown testified for several days, and the prosecutors played the tapes Mr. Brown had made at the government's behest. Rothstein Affidavit at 4. Mr. Rothstein characterized the tapes as "among the most important pieces of evidence" in the Navajo's trial of the Chairman and Rocky MacDonald. The Navajo jury convicted both the Chairman and his son. *Id.* at 5–6.

The government now states that, because of a Department of Justice policy regarding criminal convictions obtained by other sovereigns, the United States does not intend to indict Peter MacDonald, Sr., or Peter MacDonald, Jr., on charges stemming from the Big Boquillas transaction.

### D. *The Indictment*

In its indictment, the Grand Jury charges that, beginning in February of 1989, Mr. Brown began laundering the profits from the Big Boquillas sale. The alleged laundering scheme involved banks in Arizona,

California, Nevada, and Oregon, as well as two "sham" corporations, Norwest Associated Mortgage Group, Ltd., and North American Diversified Enterprises, Inc. Count I charges Bud Brown and his brother Truett with conspiracy to avoid the currency reporting requirements, to cause banks to fail to file currency transaction reports, and to conceal from the Treasury Department the existence, origin, and transfer of $500,000 in cash. Counts II–XIII charge the defendants with money laundering and currency structuring. Counts XIV–XVIII charge the defendants with making false, fictitious, and fraudulent statements on U.S. Treasury Form 4789 about bank transactions involving certificates of deposit.

### III. Motion to Rescind the Non–Prosecution Agreement

The government moves to rescind the non-prosecution agreement that granted Mr. Brown transactional immunity. The government argues that (1) the agreement is voidable because Mr. Brown misrepresented certain facts, and (2) Mr. Brown breached the agreement by omitting reference to payments made to the Chairman, by shielding the Chairman, and by laundering the money. The government further argues that, if the agreement is rescinded, it may employ his use-immunized Senate testimony against him at trial. Government's Motion to Rescind at 3. The government stresses throughout that Mr. Brown has turned out to be a rather poor choice as a government witness, and that it would be difficult to present him to a jury. Mr. Brown argues that the government, having repeatedly reasserted the existence of the agreement, has reaffirmed the contract, waived its right to rescind, and is estopped. Further, Mr. Brown argues that this motion is the product of prosecutorial vindictiveness.

■ Non-prosecution and cooperation agreements are contractual in nature and subject to contract law standards. *United States v. Irvine,* 756 F.2d 708, 710 (9th Cir.1985); *United States v. Carrillo,* 709 F.2d 35, 36 & n. 1 (9th Cir.1983) (noting

that contract principles apply where the analogy is appropriate, but that contract principles would not apply in all cases). In *Irvine*, the Ninth Circuit explained

> The language of the contract is to be read as a whole and given a reasonable interpretation (Citation omitted), not an interpretation that would produce absurd results. (Citation omitted.) "[I]t is our task to construe the words used to try, if possible, to carry out the intention of the parties in light of all the facts and surrounding circumstances...." (Citation omitted.)

*Irvine*, 756 F.2d at 710–11.

Given that the non-prosecution agreement stands on footing similar to that of a plea agreement, it is the job of the District Court to determine what the parties agreed to. *United States v. Sutton*, 794 F.2d 1415, 1423 (9th Cir.1986). The relevant terms of the non-prosecution agreement include the following:

(1) The government agreed not to prosecute Mr. Brown for "any possible criminal conduct and criminal and civil liability arising out of the transaction and resulting investigation" of the Big Boquillas land sale.

(2) Mr. Brown agreed to provide "complete, truthful, and candid disclosure of all information" he had about federal law violations committed by various parties, with "no knowing omissions or withholding of information."

(3) Mr. Brown agreed to "cooperate totally," which was defined to include, but not be limited to, testifying in various types of proceedings, and providing documents, records, and the like.

(4) The parties agreed that the immunity concerned only matters arising out of the Big Boquillas investigation, and did not extend to any other federal crimes.

(5) The parties agreed that if Mr. Brown "should fail in any way to fulfill completely each of the obligations outlined in this agreement, then the government will be released from its commitments."

The sole basis for the motion to rescind is Mr. Brown's failure to reveal some of the payments to the Chairman prior to entering the non-prosecution agreement. As described in detail above, Mr. Brown told Senate counsel Ballen in November 1988 that there were no cash payments to Chairman MacDonald other than the $25,000 note payment and the BMW. He told the same story to U.S. Attorneys investigating the case. On December 12, he executed the non-prosecution agreement to obtain transactional immunity. Over the next few weeks, he wore a wire for the U.S. Attorney many times. On January 11, he met with Mr. Ballen to change his testimony, and described for the first time the "golf ball" payments to the Chairman following the Big Boquillas sale, and the proposed three-way split. A day or two later, Mr. Brown's attorney spoke about the new testimony to Mr. McNamee. Also, Mr. Ballen spoke to Mr. McNamee, and perhaps to Mr. Stooks. Finally, Mr. Brown's attorney sent a copy of the deposition transcript to Mr. Stooks, although Mr. Stooks maintains he never received it. A month later, February 7, Mr. Brown testified before the Senate.

The U.S. Attorneys currently handling the case state that they personally never learned about the cash payments to Chairman McDonald from Mr. Brown. Rather, they learned about the payments from Peter MacDonald, Jr., in August of 1989, and that they learned about the intended three-way split of the profits from the Chairman himself during plea negotiations in the spring of 1989.

### A. *Misrepresentation Prior to the Non–Prosecution Agreement*

█ The government argues that the U.S. Attorney's office was under a mistaken impression of fact when it entered into the non-prosecution agreement, and that it therefore may rescind it. The government relies on *In re Rigden*, 795 F.2d 727, 732 (9th Cir.1986), a case involving real estate contracts under Arizona law. The government asserts that this case stands for the proposition that a unilateral mistake of fact renders the contract void. In fact, *Rigden*

simply states the well-accepted rule from the Restatement (Second) of Contracts § 153: "a unilateral mistake about an underlying assumption of the contract may render a contract voidable if the mistake makes the enforcement of the contract unconscionable." *Rigden,* 795 F.2d at 732. The government simply fails to demonstrate that, even if there was a unilateral mistake, enforcement of this agreement is unconscionable.

The government correctly argues that misrepresentation of an essential element of a contract renders it voidable. *See Cohen v. Wedbush, Noble, Cooke, Inc.,* 841 F.2d 282, 287 (9th Cir.1988) (citing traditional common law principle that misrepresentation renders a contract voidable if plaintiff reasonably relied on the misrepresentation). However, the government fails to demonstrate that the issue of these payments was an essential element of the contract. The government refers to the question of the bribery of Chairman MacDonald as "the most important factual issue underlying the agreement." Government's Motion to Rescind at 22. However, the government already knew that Mr. Brown had bribed MacDonald with the $25,000 loan payment and the BMW. The government also knew that Mr. Brown had promised to "take care" of MacDonald. To say that Mr. Brown misled the government about the fact of bribery is simply wrong; if the government was misled, it was merely as to the scope of the bribery.

In the same vein, the government argues that it thought it was bargaining for a witness who was "minimally culpable," but instead got a witness who is a "liar" and a "professional briber." *Id.* at 22–23. The theory of this argument appears to be that Mr. Brown was misrepresenting his character and the scope of his involvement in the scheme. However, it is difficult to believe that the government, being aware of the earlier payments to Chairman MacDonald, and the millions of dollars of profit taken by Mr. Brown, would have thought that Mr. Brown was anything but culpable and anything but a briber.

The argument that Mr. Brown is a liar is similarly unpersuasive. While Mr. Brown was untruthful initially, he corrected his misstatements himself a few weeks after the immunity agreement. The government's expressed fear is that his initial lies will bear on his credibility before the jury. This argument bears little weight in light of the facts: Mr. Brown has been instrumental in obtaining convictions of the MacDonalds in the Navajo court, and, because of these convictions, the government has abandoned its intention to try the MacDonalds on charges stemming from the Big Boquillas transaction.

### B. Breach of Non–Prosecution Agreement

■ The government argues that Mr. Brown's conduct, subsequent to the non-prosecution agreement, violated several express terms of the agreement, including those requiring Mr. Brown to provide complete and candid disclosure, to make no knowing omissions, to not attempt to protect any person through false information or omission, and to cooperate totally with the government's investigation. If Mr. Brown breached the terms of the agreement, the government may be entitled to rescission. *See, e.g., United States v. Partida–Parra,* 859 F.2d 629, 633 (9th Cir. 1988) (analyzing rescission issue in context of plea agreements, and questioning extent of applicability of contract-law principles in criminal proceedings); *United States v. Reardon,* 787 F.2d 512, 516 (10th Cir.1986).

First, the government states that Mr. Brown, after signing the agreement, denied making cash payments to Chairman MacDonald. Although the record clearly indicates Mr. Brown's denials prior to signing the agreement (*see, e.g.,* Government's Memo in Support of Rescission, Exhibit E (FBI Agent Lescoe's summary of statement by Byron Brown of December 9, 1988)) there is no evidence of an express denial after he signed the agreement. Clearly, however, Mr. Brown omitted reference to these payments.

The government's argument directly relates to the issue of Mr. Brown's conduct in

the weeks immediately following the execution of the non-prosecution agreement. Mr. Brown alerted the U.S. Attorney's office to his new testimony. The U.S. Attorney, however, made the affirmative decision to shield personnel from the fact of the new testimony, the substance of it, and the later public revelation of it through the Senate hearings. The evidence clearly shows that the government had several competing agendas, and made certain choices in order to accomplish them. First, the U.S. Attorney's office wanted to protect its ability to pursue Peter MacDonald, Jr., without tainting its investigation. Second, because certain members of the office continued to object to the immunity deal, they wanted to preserve the ability to pursue Mr. Brown without taint from the U.S. Senate's investigation. Finally, the government apparently did not want to reveal its hand to Mr. Brown, and therefore did not notify him either that it considered him to be in breach or that it was shielding members of the U.S. Attorney's office from his new testimony. Having chosen to avoid Mr. Brown's truthful testimony, and to not alert Mr. Brown to this after January 11, 1988, the government cannot reasonably assert that Mr. Brown's conduct was a breach.

Second, the government asserts that Mr. Brown attempted to shield Chairman MacDonald by not revealing the cash payments received from Mr. Brown. This argument is unpersuasive, both because Mr. Brown had already informed the government of other payments he made to the Chairman, and because Mr. Brown testified in public Senate hearings to all of the cash payments, which led directly to the Chairman's fall from power.

Third, the government charges that, had it known in December about Mr. Brown's cash payments to the Chairman, it would have conducted its investigation differently, such as by having Mr. Brown deliver money to the Chairman "in a controlled environment." Arguably, the government might not have been able to do this, even if it had tried. The record indicates that no payment was ever made to the Chairman unless he requested it. Furthermore, when

considered in the context of other incriminating evidence that Mr. Brown's covertly recorded sessions with the Chairman produced, it is not clear that the government's inability to gain this specific evidence on tape is material. In short, the Court is unpersuaded that this aspect of Mr. Brown's conduct seriously undermined the government's investigation.

■ Finally, the government charges that the money laundering itself constitutes a breach of the non-prosecution agreement. The government relies on *United States v. Irvine*, 756 F.2d 708 (9th Cir.1985), in which Irvine entered into a use-immunity agreement that required him to provide information about drug traffickers and testify against them. Irvine's cooperation led to the indictment of Luis Betancourt. After the indictment, however, Irvine met with Betancourt and offered to leave the country to avoid testifying against him, in exchange for $100,000 worth of cocaine. *Id.* at 710. The government then indicted Irvine on drug and bribery charges. The Ninth Circuit held that the district court properly refused to exclude evidence obtained under the immunity agreement on the basis that Irvine could not, under the agreement, attempt to frustrate the government's case against Betancourt. *Id.* at 710–12.

Based on *Irvine*, the government argues that the "cooperate totally" clause of the non-prosecution agreement imposed upon Mr. Brown a burden of "limitless breadth," requiring him "to remain a credible and law abiding witness useful to the government." Government's Motion to Rescind at 26. First, this is simply an overbroad reading of the agreement. Under the government's interpretation, if Mr. Brown committed a totally unrelated crime, the government could rescind this agreement, and prosecute him for the Big Boquillas transaction, in addition to prosecuting him for the unrelated crime. Nothing in the language of the agreement suggests that Mr. Brown was required to become a model citizen to facilitate the government's case. Second, the crimes charged here do not bear the same relationship to the agree-

ment as those in *Irvine*. Irvine's conduct was a direct attempt to frustrate the government's case; Mr. Brown's conduct affects his credibility, but does not bear directly on any case against MacDonald.

### C. *Ratification, Waiver, and Estoppel*

Mr. Brown argues that, even if there was a breach of the non-prosecution agreement, the government cannot now move for rescission after having (1) reaffirmed the existence of the agreement on many occasions, (2) obtained Mr. Brown's continuing compliance with the agreement, and (3) led Mr. Brown to believe that the government would not attempt to avoid the deal.

■ The parties agree that under traditional contract law, one who enters a contract relying on misrepresentations, but who affirms the contract after learning the truth, relinquishes the right to rescission. *See, e.g., Page Inv. Co. v. Staley*, 105 Ariz. 562, 563, 468 P.2d 589, 590 (1970). The doctrines of waiver and estoppel have a similar import. *See, e.g., Saverslak v. Davis–Cleaver Produce Co.*, 606 F.2d 208, 213 (7th Cir.1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1029, 62 L.Ed.2d 762 (1980) (right waived by conduct inconsistent with intent to enforce the right); *Palermo v. Warden, Green Haven State Prison*, 545 F.2d 286, 295 n. 12 (2d Cir.1976) (estoppel prevents disavowal of contract in face of detrimental reliance on the contract), *cert. denied*, 431 U.S. 911, 97 S.Ct. 2166, 53 L.Ed.2d 221 (1977). The government adds, however, that the Ninth Circuit holds that in some cases, contract principles do not bind the Court in considering a non-prosecution agreement. *United States v. Carrillo*, 709 F.2d 35, 36 (9th Cir.1983).

■ Mr. Brown argues that the government reaffirmed the existence of the contract on many occasions after being notified of Mr. Brown's changed testimony. First, there are several letters in which the government indicates that it considers Mr. Brown bound by the agreement. Indeed, the government reasserted Mr. Brown's obligation under the agreement in a plea offer letter in June of 1990. Defendant's Motion to Dismiss, Exhibit 11. Mr. Brown also notes several contacts between U.S. Attorneys and Mr. Brown or his lawyers, made pursuant to the agreement.[11] For example, Kleindienst arranged a meeting with Mr. Brown for a debriefing under the agreement in March of 1990. *See* Letter from Wallace Kleindienst to Richard Mahrle, March 5, 1990. Kleindienst ultimately cancelled that meeting, then arranged for one in June. *See* Letter from Wallace Kleindienst to Melvin McDonald, June 8, 1990. He cancelled that meeting on the date scheduled, informing Mr. Brown that the government intended to indict him. Second, the government requested that Mr. Brown waive any potential attorney-client privilege he might have with Richard Vermeire, an attorney who had represented Chairman MacDonald. Defendant's Memorandum in Opposition to Government's Motion to Rescind, Exhibit 19, 3 (Affidavit of Richard Mahrle (February 25, 1991)). Third, Mr. Brown testified against Chairman MacDonald at the Navajo Tribe's criminal trial.

The government does not seriously contest the fact that it reaffirmed the existence of the agreement repeatedly for over two years. Instead, the government argues that it received no significant cooperation from Mr. Brown. The government asserts that the events Mr. Brown describes were not in fact cooperative. For example, the waiver of the attorney-client privilege with respect to Mr. Vermeire was unnecessary, because the communications fell into the crime-fraud exception to the rule. Further, Mr. Brown was notified by the government that it did not view the non-prosecution agreement as requiring Mr. Brown to testify at the Navajo trial.

---

**11.** It is worth noting that Mr. Kleindienst contacted Mr. Brown after learning that lawyers connected to the Navajo Nation's civil suit against Mr. Brown could not locate him. Mr. Kleindienst spoke with Mr. Brown, reasserting the validity of the agreement, and then agreed to be deposed in the Navajo case, in apparent violation of the non-prosecution agreement. *See*, Defendant's Memorandum in Opposition to Government's Motion to Rescind, Exhibit 20 (Deposition of Wallace Kleindienst (Nov. 15, 1989)).

The Court finds the government's argument unavailing. It is indisputable that the government repeatedly reasserted the existence of the agreement and Mr. Brown's obligations under it. The fact that the attorney-client waiver was in fact unnecessary is irrelevant; what matters is that the government requested the Mr. Brown waive the privilege pursuant to the agreement. Similarly, the government's last-minute notification that the agreement did not require Mr. Brown to testify at Window Rock is self-serving. Mr. Kleindienst admits that his interpretation was informed by the "adversarial" nature of the relationship with Mr. Brown, given that the government had told him by then of its plans to indict him. It is telling that Mr. Kleindienst himself viewed his approach as an attempt to "straddle the fence," by neither enforcing nor avoiding the agreement.

The Court concludes, on these facts, that if the level of Mr. Brown's cooperation was minimal, it was due largely to the government's failure to seek meaningful cooperation. The government elected not to hold further interviews with Mr. Brown after his Senate testimony. Further, the government may have intentionally avoided seeking Mr. Brown's cooperation in the Navajo case after deciding to prosecute him, although the government arguably was entitled to request it. The government repeatedly reasserted the existence of the agreement and Mr. Brown's duties under it when requesting meetings or notes of conversations. Under the circumstances, it appears that Mr. Brown complied with every request made by the government, and that he made all reasonable efforts to live up to his obligations.

### D. *Prosecutorial Vindictiveness*

■ Mr. Brown argues that the motion to rescind should be denied because it has been brought out of a sense of vindictiveness, solely in response to Mr. Brown's assertion of his rights under the non-prosecution agreement. Mr. Brown cites several cases applying the rule that vindictive prosecution is unconstitutional. *E.g., Thigpen v. Roberts*, 468 U.S. 27, 30–31, 104 S.Ct. 2916, 2918–19, 82 L.Ed.2d 23 (1984) (prose-

cution for manslaughter was vindictive response to defendant's exercise of right to trial de novo on misdemeanor charges); *United States v. Heldt*, 745 F.2d 1275, 1280–81 (9th Cir.1984) (prosecution for additional charges in superseding indictment, after failure of parties to reach a plea agreement, was not vindictive); *United States v. Krezdorn*, 718 F.2d 1360, 1365 (5th Cir.1983) (prosecution for additional charges, after remand from appellate court, was not vindictive), *cert. denied*, 465 U.S. 1066, 104 S.Ct. 1416, 79 L.Ed.2d 742 (1984).

While it is clear that the government's motion is a response to Mr. Brown's assertion of his rights under the agreement, the motion is not a "prosecution." The Court is inclined to agree with defendant's interpretation of the motion to rescind, but concludes that, under prevailing law, a motion to rescind this agreement should not be treated as a vindictive prosecution.

### E. *Conclusion*

This case, and this motion, are the unlikely culmination of years of investigation of the Big Boquillas ranch scandal. It represents, if anything, the unfortunate outcome of parallel investigations by different branches of government and different sovereign entities, with their competing perspectives and interests. The Court is compelled to conclude, under the facts of this case, including the decision to enter the non-prosecution agreement, the decision not to rescind it immediately, the decision to reaffirm the agreement, and the decision not to reap more substantial benefit, that the U.S. Attorneys have placed themselves in a position which prevents them from avoiding the non-prosecution agreement.

The government has failed to demonstrate that Mr. Brown made material misrepresentations to induce the government to enter the agreement. Mr. Brown's misstatements about the "golf ball" payments to the Chairman, in light of what the government already knew, are immaterial. The government cannot reasonably assert that it would not have entered the agree-

ment had it known the true facts, nor can it reasonably assert that these payments catapulted Mr. Brown from the characterization "minimally culpable" to that of "professional briber."

The government has also not demonstrated that Mr. Brown is in breach. To the extent that Mr. Brown's misstatements constituted a breach of the agreement when it was made, that breach was remedied by Mr. Brown's corrected testimony in January of 1989. The U.S. Attorney was notified that the testimony had changed, and Mr. Brown's attorney mailed a copy of the deposition transcript to the U.S. Attorneys. Even if the government did not receive the transcript, Mr. Brown's notice is sufficient to correct the bulk of the damage that had been done by the earlier false statements. The government's choice to shield itself from Mr. Brown's new testimony cannot be construed as a breach by Mr. Brown.

Nor do Mr. Brown's subsequent cash transactions, the subject of the money laundering charges, place him in breach. Mr. Brown's conduct does not so undermine the government's investigation of or case against Chairman MacDonald that it should be allowed to rescind this agreement. Unlike the *Irvine* case, on which the government relies, Mr. Brown's conduct does not strike at the heart of the non-prosecution agreement.

Finally, even if Mr. Brown's initial failure to admit to the "golf ball" payments were a breach, the government has repeatedly reaffirmed this agreement, and indicated to Mr. Brown that he was bound by it. Both the doctrines of ratification and waiver apply here to prevent the government from avoiding the contract at this late date. The government failed to rescind at the time it learned of the misstatements, and has remained in a position to benefit from the agreement during its two-year investigation. The government's election not to reap substantial benefit from Mr. Brown does not change this result.

Therefore, the government's motion to rescind the non-prosecution agreement is DENIED.

IV. Motion to Dismiss the Indictment

Mr. Brown moves to dismiss the indictment on the basis of the grants of use immunity and transactional immunity. He also argues Counts II–XVIII must be dismissed for failure to charge "prosecutable" crimes. The government defends the indictment on the basis that the immunity grants do not cover subsequent crimes. The government also argues the charges are not defective on any other grounds.

The indictment contains charges of:

(1) Count I: Conspiracy, under 18 U.S.C. § 371, to avoid reporting requirements (18 U.S.C. § 1956(a)(1)(B)), to cause banks to fail to report (31 U.S.C. § 5324), and to conceal material facts from the Department of Treasury (18 U.S.C. § 1001).

(2) Counts II–XIII: Money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B).

(3) Counts XIV–XVIII: Making false statements, in violation of 18 U.S.C. § 1001.

A. *The Immunity Grants*

Two grants of immunity are at issue in this case. First, the Senate has granted Mr. Brown use and derivative use immunity under 18 U.S.C. §§ 6002 and 6005. Section 6002 provides that a witness who has been granted use immunity may not refuse to testify on the basis of the privilege against self-incrimination,

> but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

The Supreme Court has held that use immunity under § 6002 is "coextensive with the scope of the privilege against self-incrimination.... While a grant of immunity must afford protection commensurate with that afforded by the privilege, it need

not be broader." *Kastigar v. United States*, 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed.2d 212 (1972).

Second, by virtue of the non-cooperation agreement with the U.S. Attorney, the government has granted Mr. Brown transactional immunity.[12] On the coverage provided by transactional immunity, the Court stated:

Transactional immunity, which affords full immunity from prosecution for the offense to which the compelled testimony relates, affords the witness considerably broader protection than does the Fifth Amendment privilege. The privilege has never been construed to mean that one who invokes it cannot subsequently be prosecuted. Its sole concern is to afford protection against being "forced to give testimony leading to the infliction of 'penalties affixed to ... criminal acts.'"

*Kastigar*, 406 U.S. at 453, 92 S.Ct. at 1661 (footnotes and citations omitted). As noted earlier, Mr. Brown's immunity agreement with the government provides that he will not be prosecuted "for any possible criminal conduct and criminal and civil liability arising out of the transaction and resulting investigation" of the Big Boquillas ranch sale.

### 1. Use Immunity

The government argues that Mr. Brown's use immunity does not protect him from prosecution for these crimes because he committed them after being granted immunity. The traditional rule is that immunity applies only to past criminal acts about which the witness must testify. *United States v. Bryan*, 339 U.S. 323, 340, 70 S.Ct. 724, 735, 94 L.Ed. 884 (1950). But there is no strict rule of chronological analysis. In *Marchetti v. United States*, 390 U.S. 39, 53–54, 88 S.Ct. 697, 705, 19 L.Ed.2d 889 (1968), the Court held that the privilege against self-incrimination cannot be applied so rigorously as to exclude prospective acts; rather the central issue is "whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination."

The government relies on several cases in which use immunity did not shield post-immunity criminal conduct. For example, in *United States v. Apfelbaum*, 445 U.S. 115, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980), the Court held that a defendant's immunized testimony could be used against him in a subsequent prosecution for making false statements while testifying. There was no question that defendant's *false* statements could be used against him; that holding followed naturally from the immunity statute and the scope of the privilege itself. Rather, the issue in *Apfelbaum* was whether the defendant's *truthful* statements could be used against him in his perjury trial. Applying the *Marchetti* analysis, the Court stated that at the time the defendant asserted the privilege, he was not confronted with more than a trifling or imaginary risk of self-incrimination as a result of the possibility that he might commit perjury. *Id.* at 130–31, 100 S.Ct. at 957.

The government also relies on *United States v. Quatermain, Drax*, 613 F.2d 38 (3rd Cir.), *cert. denied*, 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980), which held that the defendant's immunity did not protect him from prosecution for a later, unrelated crime, even though the criminal conduct was solicited by an individual about whom the defendant had testified. *See also, United States v. Harvey*, 869 F.2d 1439 (11th Cir.1989) (holding that use immunity and informal transactional immunity granted in connection with drug offenses did not bar prosecution for failure to report interest income after the grant of immunity).

■ While the government argues that these cases demonstrate a strict chronological analysis, the better view is that they indicate that immunity does not protect one from prosecution for crimes which arise wholly after the grant of immunity, or which are unrelated to the immunity. The recurring theme in these cases is that criminal activity which has not begun at the time the privilege is invoked is not protect-

---

**12.** Prior to 1970, transactional immunity was statutory as well. Now, it is the product of non-prosecution agreements only. *See Kastigar*, 406 U.S. at 452, 92 S.Ct. at 1660–61.

ed. *See Apfelbaum*, 445 U.S. at 130, 100 S.Ct. at 948 (privilege does not extend to false testimony defendant might later decide to give); *Quatermain*, 613 F.2d at 42–43 (privilege does not extend to different type of criminal conduct defendant may commit in the future); *Harvey*, 869 F.2d at 1448 (privilege does not extend to tax crimes that could only have occurred in the future).

■ These cases do not reach the situation presented here, because, with respect to Counts II–XIII, the criminal conduct alleged had already begun. The essence of money laundering is hiding the proceeds of criminal activity. Two necessary elements of money laundering are that the money be the proceeds of a specified unlawful activity [13] and that the defendant know that the money constitutes unlawful proceeds. 18 U.S.C. § 1956(a)(1). At the time Mr. Brown asserted the privilege, his conduct satisfied two elements of the government's claim of money laundering. Because Mr. Brown had already engaged in conduct necessary to the crime of money laundering, his testimony was self-incriminating as to that conduct.

This result is consistent with *Marchetti*, which recognizes that the privilege must extend to ongoing criminal acts, because of the real and substantial risk that the testimony will implicate the defendant in criminal conduct completed in the future. *Marchetti*, 390 U.S. at 54, 88 S.Ct. at 706. Similarly, this conclusion follows from the Supreme Court's historical recognition that the privilege against self-incrimination protects an individual who is forced to give testimony that leads to the infliction of penalties affixed to criminal acts. *Kastigar*, 406 U.S. at 453, 92 S.Ct. at 1661 (quoting *Ullmann v. United States*, 350 U.S. 422, 438–39, 76 S.Ct. 497, 507, 100 L.Ed. 511 (1956)). Mr. Brown's testimony before the U.S. Senate would clearly lead to the infliction of penalties for money laundering if the government were allowed to use it. Therefore, Mr. Brown's use immunity prevents the government from using any of his Senate testimony, or fruits derived therefrom, against him in a prosecution for laundering the proceeds (Counts II–XIII), or for conspiracy to launder the proceeds (Count I).

Mr. Brown's use immunity does not, however, extend to the crimes alleged in Counts XIV–XVIII. These Counts charge Mr. Brown with causing a bank to make false statements on Treasury Form 4789,[14] in violation of 18 U.S.C. § 1001. These acts were committed entirely after the grant of immunity, and are unrelated to the crimes about which Mr. Brown testified. No element of § 1001 depends upon the false statements being related to unlawful proceeds. Thus, Mr. Brown's Senate testimony may be used against him in a trial on these Counts, as well as on Count I, to the extent that it charges him with conspiracy directed to these false statements.

2. Transactional Immunity

The government argues that the transactional immunity granted to Mr. Brown does not prevent this prosecution. The government admits that the non-prosecution agreement protects Mr. Brown from prosecution for (1) crimes arising out of the Big Boquillas ranch transaction, and (2) crimes arising out of the government's investigation. Government's Memorandum in Opposition to Motion to Dismiss at 21–22. The government asserts that this prosecution does not fall into either of these categories.

■ As noted above, transactional immunity affords broader protection than use immunity. While use immunity prevents only the use of immunized testimony and its fruits, transactional immunity prevents prosecution altogether for the immunized crime. *Kastigar*, 406 U.S. at 453, 92 S.Ct. at 1661.

---

13. The statute defines "specified unlawful activity." 18 U.S.C. § 1956(c)(7). There is no dispute that the Big Boquillas ranch deal included criminal acts which would fall into the definition.

14. Banks are required to file Form 4879 for transactions exceeding $10,000. The transac-

tions at issue here involve Brown's redemption of five $100,000 certificates of deposit. The government alleges that Brown fraudulently misrepresented the identity of the individuals on whose behalf the CDs were being cashed.

■ The government's argument that these charges do not arise out of the Big Boquillas deal has no merit. The non-prosecution agreement was founded on an understanding that the government would not prosecute Mr. Brown for criminal acts related to the ranch sale, and would not attempt to seek return of Mr. Brown's profits. The government, in essence, promised that Mr. Brown would not be penalized for his conduct related to that sale. There is no logic in the argument that Mr. Brown's financial transactions involving these proceeds may be the proper subject of a criminal prosecution.

This is not to say that Mr. Brown could not be prosecuted for other criminal acts committed with these funds, such as bribery or tax evasion. The critical distinction, which the government avoids, arises out of the nature of money laundering itself—the crime requires that the money itself be the product of criminal activity. Whereas Mr. Brown could be tried for bribery or tax evasion without reference to the source of the funds, he cannot be tried for money laundering without being tried for his conduct in the Big Boquillas deal. Money laundering is a derivative crime: its criminality derives from the fact that the money is the proceeds of unlawful activity. Where the government has forfeited, by way of a non-prosecution agreement, its interest in prosecuting an individual for the criminal acts related to obtaining the money, it similarly forfeits its interest in prosecuting that individual for acts which are criminal *only* because they are committed with the unlawfully obtained money.

For these reasons, Mr. Brown's non-prosecution agreement prevents the government from trying him on Counts II–XIII money laundering and on Count I, to the extent that it charges him with conspiracy to launder money.

The Court is similarly persuaded that the non-prosecution agreement prevents the government from trying Mr. Brown for conspiracy to structure transactions to avoid the currency reporting requirements under 31 U.S.C. § 5324. The structuring charge is so intricately intertwined with the money laundering counts that it cannot reasonably be analyzed apart from those counts. Under the facts of this case, the structuring is merely a component of the alleged money laundering scheme.

However, Mr. Brown's transactional immunity does not extend to the crimes charged in Counts XIV–XVIII. The false statement counts bear no relationship to the Big Boquillas sale. Further, the crimes charged in those counts are not dependent upon the source of the funds involved in the transactions, nor are they necessarily connected to the money laundering scheme for which Mr. Brown may not be tried.

B. *Legal Sufficiency of Counts XIV–XVIII*

■ Mr. Brown argues that the false statement charges must be dismissed as "fatally defective," because the Treasury Form at issue is ambiguous.

Mr. Brown is charged with making false statements on Treasury Form 4789. He completed five of these forms, one for each of five $100,000 certificates of deposit he redeemed in March of 1989. Part I of the form requests the identity of the "individual who conducted this transaction with the financial institution." Part II of the form requests the identity of the "individual or organization for whom this transaction was completed." Mr. Brown completed Part II of each of these forms with his daughter's name, Rhonda Brown. The government's argument in support of its charges is that Mr. Brown was required to name himself in Part II, because he was the individual who in fact received the money.

Mr. Brown relies on *United States v. Murphy*, 809 F.2d 1427 (9th Cir.1987), in which the Ninth Circuit held that Part II did not clearly impose a duty on a depositor of funds to disclose the source of the funds. In *Murphy*, the depositor filled in the name of the nominal account-holder, rather than the names of the IRS agents who had given him the funds. The court held it would violate due process to hold the depositor to that interpretation because the "regulations do not clearly require de-

positors to identify the source of their funds." *Id.* at 1431.

*Murphy* does not dispose of this case. Part II's requirement is far less ambiguous in the case of a cash withdrawal. Taken in context with Part I, the form fairly clearly indicates that the information sought consists of (1) the name of the person performing the transaction, and (2) the name of the person who will be receiving the money.

Mr. Brown goes on to argue that he completed the form accurately, because his daughter was a co-trustee on the account, and therefore was an intended beneficiary. This argument does not establish a fatal ambiguity. It is more appropriately an argument to be made at trial as an affirmative defense to the questions of whether Mr. Brown actually provided false information and whether Mr. Brown intended to do so.

### C. *Conclusion*

For the reasons given above, Counts II–XIII of the Indictment are DISMISSED. Count I, to the extent that it charges Mr. Brown with conspiracy to launder money under 18 U.S.C. § 1956 and conspiracy to structure currency transactions under 31 U.S.C. § 5324, is DISMISSED. The motion to dismiss Counts XIV–XVIII and Count I, to the extent that it charges conspiracy to make false statements under 18 U.S.C. § 1001, is DENIED. As indicated above, the Senate's use immunity does not cover these alleged activities, so no *Kastigar* hearing is necessary.